918 A.2d 603

TOWNSHIP OF HOLMDEL, PLAINTIFF–RESPONDENT,
v. NEW JERSEY HIGHWAY AUTHORITY,
DEFENDANT–APPELLANT.

NEW JERSEY HIGHWAY AUTHORITY, PLAINTIFF–APPELLANT,
v. TOWNSHIP OF HOLMDEL, DEFENDANT–RESPONDENT.

TOWNSHIP OF HOLMDEL, PLAINTIFF–RESPONDENT,
v. NEW JERSEY TURNPIKE AUTHORITY,
DEFENDANT–APPELLANT.

NEW JERSEY TURNPIKE AUTHORITY, PLAINTIFF–
APPELLANT, v. TOWNSHIP OF HOLMDEL,
DEFENDANT–RESPONDENT.

Argued January 30, 2007—Decided April 4, 2007.

76

*Jeffrey J. Miller,* argued the cause for appellants (*DeCotiis, Fitzpatrick, Cole & Wisler,* attorneys; *Mr. Miller, Michael R. Cole* and *Benjamin Clarke,* of counsel).

*Frederick W. Rose,* argued the cause for respondent (*Lindabury, McCormick, Estabrook & Cooper,* attorneys).

Chief Justice ZAZZALI delivered the opinion of the Court.

In this appeal, we must determine whether portions of the PNC Bank Arts Center (Arts Center), which is owned by the New Jersey Turnpike Authority (Authority), are exempt from local property taxation. The municipal tax assessor determined that the Arts Center's amphitheater and reception center were no longer entitled to tax immunity because the Authority had leased those facilities to two private, for-profit entities. Both the Tax Court and the Appellate Division held that those facilities were subject to taxation.

Because the amphitheater's current operation furthers the Arts Center's original purpose, we conclude that the amphitheater remains tax exempt. However, the reception center's construction and privatization were dramatic, unanticipated departures from the Authority's statutory mandate, and, for those reasons, we hold that the reception center is subject to taxation. Thus, we reverse in part, affirm in part, and remand for a tax assessment of the reception center.

I.

A.

In 1953, the Authority acquired 400 acres of land adjacent to the Garden State Parkway (Parkway) in Holmdel Township (Holmdel).[1] *Public Hearing Before Autonomous Authorities Study Commission* 59A (Oct. 30, 1968) [hereinafter *October 1968 Hearing*] (Statement of Authority's Executive Director D. Louis Tonti). The Authority obtained the land, known as Telegraph Hill, for the

---

[1] When this litigation was initiated, the Arts Center was owned by the New Jersey Highway Authority. However, in 2003, the Legislature merged the Highway Authority into the Turnpike Authority. *See L.* 2003, *c.* 79. After 2003, the Turnpike Authority proceeded in this litigation as the Highway Authority's successor in interest. For convenience, the appellant in this matter, i.e., the owner of the Arts Center, will be referred to as the "Authority" regardless of whether it was the Turnpike Authority or the Highway Authority.

purpose of constructing the Arts Center. *Ibid.* At that time, the Highway Authority Act (Highway Act or Act) authorized the Authority to "acquire, construct, maintain, improve, repair and operate *highway projects.*" *N.J.S.A.* 27:12B–2 (repealed by *L.* 2003, *c.* 79) (emphasis added). The Act defined "highway project" as "any express highway, superhighway or motorway . . . together with such adjoining park or recreational areas and facilities as the Authority . . . shall find to be necessary and desirable to promote the public health and welfare." *N.J.S.A.* 27:12B–3(d) (amended by *L.* 1968, *c.* 348, § 5.1(2)) (repealed). Significantly, "highway projects" were exempt from taxation. *N.J.S.A.* 27:12B–16 (repealed). The Act also empowered the Authority to enter into lease agreements with private parties if those agreements were "necessary or incidental to the performance of its duties." *N.J.S.A.* 27:12B–5(*o*) (repealed).

Construction of the Arts Center was delayed until 1965, when the Authority finally approved construction of a 5,000–seat amphitheater. *October 1968 Hearing, supra,* at 63A–64A. The Authority claimed that the Arts Center's purpose was to provide public access to the performing arts while generating more traffic on the Parkway during off-peak hours, thereby increasing toll revenue for the Authority. *Public Hearing Before Autonomous Authorities Study Commission* 65A–66A (May 14, 1968) [hereinafter *May 1968 Hearing*] (Statement of Authority's Executive Director D. Louis Tonti). The Authority maintained, therefore, that the Arts Center was statutorily authorized as a "highway project" pursuant to the Highway Act because it served the Authority's broad statutory purpose. *October 1968 Hearing, supra,* at 12A.

Construction of the Arts Center was completed in 1968. At that time, the Arts Center consisted of only the 5,000–seat amphitheater, attendant parking and restroom facilities, two miles of nature trails, and the Celebrity House, in which community botany classes were held. *May 1968 Hearing, supra,* at 69A–70A; *Public Meeting Before Senate Special New Jersey Highway Investigation Committee* 39 (Oct. 13, 1988) [hereinafter *1988 Senate Hear-*

*ing*]. The amphitheater cost nearly $6.8 million to construct, *October 1968 Hearing, supra,* at 64A, and the Authority purposefully chose its size and design based on the dimensions necessary to ensure its "economic success," *id.* at 63A. Additionally, the Authority immediately contracted with a private company for the "full responsibility of booking, handling subscriptions in ticket sales, and general management of the [amphitheater]." *Id.* at 45A. There were no reception facilities at the Arts Center in 1968. *1988 Senate Hearing, supra,* at 38–39.

However, also in 1968, the Assembly created the Autonomous Authorities Study Commission to investigate the operation of the Authority and other autonomous authorities, such as the New Jersey/New York Port Authority and the New Jersey Turnpike Authority. *See Assembly Concurrent Resolution No. 9 of 1968.* The Commission concluded that the Authority was operating without sufficient legislative oversight and that the Arts Center was only tenuously connected to the Authority's statutory mandate. *Interim Report of the Autonomous Authorities Study Commission* 3 (Jan. 1969). Consequently, the Legislature amended the definition of "highway project" to include only those "facilities *directly related* to the use of [highways]." *L.* 1968, *c.* 348, § 1 (amending *N.J.S.A.* 27:12B–3(d) (repealed)). The 1968 Amendment's unequivocal purpose was to "prevent repetitions" of unauthorized projects such as the Arts Center. *May 1968 Hearing, supra,* at 2; *see also Monarch Entm't Bureau, Inc. v. N.J. Highway Auth.,* 715 *F.Supp.* 1290, 1297 (D.N.J.) ("The [L]egislature very clearly disapproved of the Authority's expansive interpretation of the provisions which the Authority believed authorized it to build an Arts Center."), *aff'd,* 893 *F.*2d 1331 (3d Cir. 1989). Nevertheless, because the Authority had already constructed the Arts Center and, more important, had issued State-guaranteed bonds to finance its construction, the Legislature grandfathered the Arts Center by adding the following provision to the Act: "The continued operation of existing facilities or activities by the [A]uthority shall not be affected by the provisions of this act," *L.* 1968, *c.* 441, § 1 (amending *N.J.S.A.* 27:12B–5.1

(repealed)). *See also Veto Message of Governor Richard J. Hughes with Respect to Senate Bill 493* (Sept. 19, 1968) (vetoing original amendments that did not contain grandfather provision because of financial implications for Arts Center).

### The Reception Center Lease Agreements

In 1972, notwithstanding the Legislature's directive limiting the Arts Center to "existing facilities or activities," the Authority converted the Celebrity House into a full-service banquet and reception facility. *1988 Senate Hearing, supra,* at 36–39. The Celebrity House was available to the general public as well as non-profit, corporate, and private entities. *Id.* at 37. At that time, the Celebrity House had a maximum capacity of seventy people, including service personnel. *Ibid.* In 1984, the Authority announced the construction of a larger reception center that would accommodate 350 people for "sit-down" receptions and 500 people for "stand-up" receptions. *Id.* at 39–41, 44. The final cost of the new reception center, now known as the Robert B. Meyner Reception Center, was approximately $6.4 million. *Id.* at 52.

Concerned that the Authority had blatantly disregarded the intent of the 1968 Amendments and that the reception center would result in toll increases, the Senate convened the special New Jersey Highway Authority Investigation Committee. *Senate Resolution No. 122 of 1987; see 1988 Senate Hearing, supra,* at 1 (discussing purpose of Senate Committee). The Committee concluded that "the construction of [a] $6.4 million facility violated state law which was specially amended in 1968 to limit the Authority's ability to engage in projects which are not related to the operation of the highway." *Second Interim Report of Senate Special New Jersey Highway Authority Investigation Committee* 30 (Oct. 1989). The Committee also found that the Authority conducted no research regarding the reception center's economic feasibility, *id.* at 32, engaged in inappropriate bid solicitation, *id.* at 42–44, and that the reception center was an "ill-executed" project that would not be profitable, *id.* at 33. No corrective

legislation ensued, however, and in 1989, when the reception center was completed, the Authority leased it to 116 Park Caterers (Park).

Under the terms of the Park agreement, the reception center would operate as a "first-class, high quality," catering, banquet, and conference facility. The initial agreement expired in 1993 but was subject to two-year renewal periods. It was renewed twice before it was replaced in 1996 by a similar agreement with Bott, Inc. (Bott). The terms of that agreement were identical to the Park agreement except that Bott's annual payments were greater than Park's. Bott currently operates the reception center under the terms of the 1996 agreement.

Under both the Bott and Park agreements, the lessee was responsible for the reception center's day-to-day operation. The lessees were permitted to use the reception center for "banquets, meetings, conferences, seminars, luncheons, dinners, weddings and other similar activities." The Bott and Park agreements required the lessee to "use its best efforts" to manage the reception center profitably. Accordingly, both Park and Bott operated the reception center as a for-profit catering facility available to the general public.

Both lessees were required to make minimum annual payments to the Authority. Those minimum payments were credited towards a percentage of gross receipts that the Authority was entitled to receive, which ranged from 10% to 25%. No minimum was required for 1989, but $150,000 was required for 1990, $250,000 for 1991, and $350,000 for 1992. The Bott agreement imposed a $300,000 minimum payment per year.

### The Amphitheater Lease Agreement

In 1997, the Authority leased the amphitheater to GSAC Partners (GSAC). Prior to 1997, the amphitheater was operated by the Authority in conjunction with several private companies. *See October Hearing, supra,* at 45A; *1988 Senate Hearing, supra,* at 60. The GSAC lease took effect retroactively in 1996 and expires

in 2017. The leased facilities consist of the amphitheater and related land areas, mostly parking lots. The lease also grants GSAC the right to use the two electronic billboards adjacent to the Parkway for advertisement of scheduled events and sponsors. The Authority retained the right to use the signs for non-commercial purposes.

Under the lease, GSAC holds the exclusive rights to "use, operate, and enjoy the amphitheater." However, GSAC's use of the facility is restricted to entertainment events, seminars, corporate meetings, political fund-raisers, and tangential events. Additionally, the Authority retains the right to use the amphitheater annually for up to ten ethnic-heritage festivals, twenty admission-free performances, and a winter holiday celebration. The Authority's right to use the facility is subordinate and subject to GSAC's rights.

The lease also requires GSAC to "use recognized modern business practices to provide efficient and high quality services to the public." However, in respect of programming, the "ultimate decision as to what action, if any, should be taken rests solely with [GSAC]." Nevertheless, the lease requires GSAC to use its "reasonable best efforts" to present "balanced programming" at the amphitheater.

Under the lease, GSAC has the limited right to sell alcohol on the premises. The lease restricts sales to two beverages per person per sale, requires cessation of sales one hour before the end of a performance, prohibits sales to anyone exhibiting signs of intoxication, and bars patrons from bringing alcohol onto the premises. GSAC is also authorized to sell merchandise, food, and beverages at performances.

Rent for the first year, 1997, was a minimum of $1.5 million plus 100% of GSAC's profits in excess of $1 million. Rent for the second and subsequent years was set at $1.65 million. Additionally, GSAC is obligated to pay contingent rent from gross revenues, based on a graduated scale ranging from 5% to 15%. GSAC further agreed to pay all taxes imposed on the amphitheater.

GSAC also has the right to sublease the amphitheater without the Authority's approval and mortgage its leasehold interest in the amphitheater.

Finally, the lease requires GSAC to undertake various renovations, including expansion of the amphitheater's covered and lawn seating, parking lots, restroom facilities, and access walkways and plazas. Currently, the amphitheater can accommodate over 17,000 people and, under the GSAC lease, may host performances on any day of the week.

### Holmdel's Tax Assessment

In 1998, in view of the perceived privatization of the Arts Center, Holmdel's tax assessor determined that the facilities subject to the GSAC and Bott agreements were no longer eligible for property tax exemption under the Highway Act's immunity provision, *N.J.S.A.* 27:12B–16 (repealed). The tax assessor did not assess any tax against facilities or property not implicated by the Bott and GSAC agreements, such as the New Jersey Vietnam Veterans' Memorial, the Telegraph Hill Nature Area, picnic areas, Highway Authority maintenance and administration buildings, and State Police facilities. Holmdel concedes that those facilities are tax exempt.

For 1996, the assessor imposed an "omitted added assessment" of $14,261,200 for the combined amphitheater and reception center complex. *See N.J.S.A.* 54:4–63.3 (defining "added assessment"); *N.J.S.A.* 54:4–63.12 (permitting imposition of omitted "added assessment"). For 1997, Holmdel imposed an "added assessment" in the same amount, and, for 1998, Holmdel imposed a "regular assessment" of $200. In 1998, both Holmdel and the Authority appealed those tax assessments. The Authority claimed that the assessed property and facilities were statutorily exempt from property taxation, and Holmdel sought an increase in the amount of each assessment.[2]

---

[2] Neither the Authority nor Holmdel appealed the tax assessments for 1999 or 2003. However, in actions separate from this appeal, the Authority and Holm-

## B.

In 1999, the Tax Court granted the Authority's motion for summary judgment, holding that the Arts Center was entitled to tax immunity. The Appellate Division reversed and remanded for a determination whether the amphitheater's use under the GSAC lease coincided with the use that the Legislature envisioned in 1968; whether the reception center, completed in 1989, was contemplated by the Legislature in 1968; and, if so, whether the use of the reception center under the Bott agreement is too far removed from the Legislature's initially-contemplated use to warrant tax immunity. *Twp. of Holmdel v. N.J. Highway Auth.*, 329 *N.J.Super.* 410, 431–32, 748 *A.*2d 128 (App.Div.2000).

On remand, the Tax Court concluded that the amphitheater and reception center were "significantly different, physically and in [their] operation," than the Legislature contemplated in 1968. *Twp. of Holmdel v. N.J. Highway Auth.*, 22 *N.J.Tax* 428, 451–52 (2005). The Tax Court held that the reception center was subject to tax for all years in question and that the amphitheater was subject to tax beginning in 1997, the first year for which the GSAC lease was actually operative. *Id.* at 466. Thus, the court held that the reception center and amphitheater were both subject to taxation for 1997, 1998, 2000, 2001, 2002, and 2004, and that, for 1996, only the reception center was taxable. *Ibid.* On appeal, the Appellate Division summarily upheld the Tax Court's ruling. *Twp. of Holmdel v. N.J. Highway Auth.*, 388 *N.J.Super.* 36, 40, 905 *A.*2d 900 (App.Div.2006). Both parties sought leave to file an interlocutory appeal, which we granted. 188 *N.J.* 570, 911 *A.*2d 64 (2006).

---

del contested the tax assessments for years 2000, 2001, and 2004. For 2002, only the Authority contested the assessment. For each of those contested years, the tax assessor determined that the Authority owed $1,717,000. Thus, there are appeals pending regarding the Authority's tax immunity for years 2000, 2001, 2002, and 2004 that are not directly implicated by this appeal. However, the parties have stipulated that the resolution of this appeal will govern the Authority's tax liability in those pending appeals.

## II.

In arguing that the amphitheater and reception center are no longer tax exempt, Holmdel points to the 1968 Amendments to the Authority's enabling statute, *L.* 1968, *c.* 348; *L.* 1968, *c.* 441. Those amendments expressly prohibited the Authority from constructing or operating "any facility . . . not directly related to the use of a highway project," *L.* 1968, *c.* 348, § 2 (amending *N.J.S.A.* 27:12B–5.1 (repealed)), but permitted the Authority to continue operating all "existing facilities or activities," *L.* 1968, *c.* 441, § 1 (amending *N.J.S.A.* 27:12B–5.1 (repealed)). Thus, Holmdel argues that the Arts Center is subject to taxation because the Park and GSAC lease agreements extend the Arts Center's operation beyond what existed in 1968.

The Authority responds that the lease agreements have not substantially altered the use of the Arts Center, and tax immunity therefore still applies. The Authority also argues that in 2003 the Legislature resolved any doubts regarding the tax immunity of the Arts Center because it merged the Highway Authority into the Turnpike Authority and expressly declared the Arts Center to be a "highway project" of the Turnpike Authority. *See L.* 2003, *c.* 79 [hereinafter Merger Legislation] (amending *N.J.S.A.* 27:23–4).

## III.

### A.

■ This appeal concerns an issue of statutory interpretation, which we review de novo. *Hodges v. Sasil Corp.*, 189 *N.J.* 210, 221, 915 *A.*2d 1 (2007) (citing *Balsamides v. Protameen Chems., Inc.*, 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999)). Additionally, although the Arts Center's history is pertinent because it presents extrinsic evidence of the Legislature's intent, the Tax Court's specific findings regarding the history of the Arts Center are not entitled to deference by a reviewing court. *See DiProspero v. Penn*, 183 *N.J.* 477, 492–93, 874 *A.*2d 1039 (2005) (discussing proper use of extrinsic interpretive aids). Therefore, to the extent

that it is appropriate for us to consider extrinsic evidence of legislative intent, we conduct an independent review of the Arts Center's history.

## B.

We begin our analysis with a review of the basic legal principles relevant to governmental tax immunities. All real property within New Jersey is subject to taxation, *N.J.S.A.* 54:4–1, unless expressly exempted by the Legislature, *see N.J. Const.* art. VIII, § 1, ¶ 2 (authorizing legislative tax exemptions). Judicial interpretation of statutory tax exemptions is governed by principles of general statutory construction. *Walter Reade, Inc. v. Dennis*, 36 *N.J.* 435, 440, 177 *A.2d* 752 (1962). Thus, when interpreting a statutory tax exemption, the "Legislature's intent is the paramount goal . . . and, generally, the best indicator of that intent is the statutory language." *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.2d* 1039; *see also Walter Reade, supra,* 36 *N.J.* at 441, 177 *A.2d* 752 ("[T]he decision turn[s] upon the intention of the Legislature in the statute creating the agency and providing for the exemption.").

The New Jersey Constitution restricts the Legislature's authority to grant tax exemptions. *See* Robert F. Williams, *The New Jersey State Constitution* 109–15 (1997) (discussing interrelated constitutional provisions that restrict scope of statutory tax immunities). The Legislature may grant exemptions only by "general laws" and must base exemptions on the property's use, not the owner's identity. *N.J. Const.* art. VIII, § 1, ¶ 2; *see also N.J. Const.* art. IV, § 7, ¶ 9(6) (prohibiting special laws in respect of taxation); *N.J. Turnpike Auth. v. Washington Twp.,* 16 *N.J.* 38, 44–45, 106 *A.2d* 4 (1954) (finding tax exemptions based on owner's personal status unconstitutional). Thus, it is unconstitutional to award tax exemptions simply because a government agency owns the subject property. *See Moonachie v. Port of N.Y. Auth.,* 38 *N.J.* 414, 427–28, 185 *A.2d* 207 (1962). The tax exemption must be based on the property's use, and the property must, in fact, be put

to that use. *Washington Twp., supra,* 16 *N.J.* at 45–46, 106 *A.*2d 4.

 Judicial interpretation of statutory tax exemptions implicates competing considerations. On one hand, tax immunities for government authorities should be liberally construed because they facilitate the provision of public services. *See Walter Reade, supra,* 36 *N.J.* at 440, 177 *A.*2d 752; *see generally* Rob Gunning, *Into and Out of the Bog: The Intergovernmental Tax Immunity Doctrine,* 41 *Willamette L.Rev.* 151, 203 (2005). Even where government agencies lease property to private entities, exemptions should be liberally construed because they "ultimately favor private-sector activities [that] the state considers to be valuable." *Gunning, supra,* 41 *Willamette L.Rev.* at 203. On the other hand, as Chief Justice Vanderbilt observed, "The taxing power lies at the heart of government. Without taxes government could not function. Any impairment of the taxing power affects the life-blood of government." *Washington Twp., supra,* 16 *N.J.* at 44, 106 *A.*2d 4; *accord Moonachie, supra,* 38 *N.J.* at 423, 185 *A.*2d 207. Local governments are especially dependent on property taxes for revenue, and significant tax exemptions place added burdens on private property owners who are required to fill the tax-gap created by governmental immunities. *See Moonachie, supra,* 38 *N.J.* at 423, 185 *A.*2d 207 ("[Tax immunities] cast[ ] a proportionately greater share of support of state and local government upon the private property owner"). "Accordingly[,] claims for tax exemptions have to stand scrutiny," *Washington Twp., supra,* 16 *N.J.* at 44, 106 *A.*2d 4, and tax immunity for government agencies should be denied if the property benefiting from the tax exemption is not "within the scope" of the agency's statutory purpose, *Moonachie, supra,* 38 *N.J.* at 427, 185 *A.*2d 207.

 This Court has recognized that private lease agreements do not automatically forfeit an agency's tax immunity. *See Walter Reade, supra,* 36 *N.J.* at 441, 177 *A.*2d 752 (holding that private operation of highway service plazas did not forfeit governmental immunity). Rather, the determinative inquiry is whether the

property is utilized in furtherance of the agency's statutory mandate. *Id.* at 440–41, 177 *A.*2d 752. If a government property or facility is leased to a private entity and the private entity operates the property or facility in accordance with the agency's statutory purpose, the tax immunity may still apply. *Ibid.*

This Court's holding in *Moonachie, supra,* illustrates the proper application of those principles. 38 *N.J.* at 429, 185 *A.*2d 207. In that case, the Port Authority had acquired a ten-acre parcel of land to use as a sound barrier around an airport and then leased the property to a private, for-profit company that constructed a factory on the land. *Id.* at 417, 185 *A.*2d 207. The Port Authority was authorized to acquire property necessary and incidental to the construction and maintenance of airports, *N.J.S.A.* 32:1–35.18, and the Port Authority's enabling statute granted tax immunity to all property used for such purposes, *N.J.S.A.* 32:1–35.5. Although we held that the land was exempt because the Port Authority used it for approved purposes, *Moonachie, supra,* 38 *N.J.* at 429, 185 *A.*2d 207, we concluded that the factory building was not exempt because it was "not being used for air terminal purposes within the legislative meaning of those terms," *id.* at 421, 185 *A.*2d 207. We declared that "a tax exemption based upon a statute specifying a particular public use is clearly lost when the use to which the property is put is foreign to the prescribed use." *Id.* at 426, 185 *A.*2d 207.

In view of those principles, this appeal presents a unique question. When the 1968 Amendments to the Highway Act were first enacted, they redefined the Authority's statutory mandate to exclude the Arts Center. Following the Governor's veto of those amendments, the Legislature enacted a special exception for the Arts Center without enlarging the Authority's mandate. The effect of that grandfather provision was to authorize, and immunize, a project that would otherwise exceed the Authority's statutory purpose. In this unusual case, therefore, the amphitheater and reception center are entitled to tax immunity if their current operation is consistent with the intent of the 1968 grandfather

provision, not the Authority's overall mandate as redefined by the 1968 Amendments.

## IV.

We now consider whether the current operation of the amphitheater and reception center is within the intended scope of the 1968 grandfather provision. We discuss the amphitheater and the reception center separately, beginning with the amphitheater.

## A.

The 1968 grandfather provision states, "The continued operation of existing facilities or activities by the [A]uthority shall not be affected by the provisions of this act." *L.* 1968, c. 441, § 1 (amending *N.J.S.A.* 27:12B–5.1 (repealed)). In 1968, the Arts Center's "existing facilities" consisted of only the amphitheater, two miles of nature trails, and the Celebrity House, which, at that time, was used to host botany classes. *May 1968 Hearing, supra,* at 69A–70A. The Telegraph Hill property was also the site of various administrative buildings and maintenance workshops. *October 1968 Hearing, supra,* at 64A–65A.

However, most significant to this appeal, the amphitheater was initially operated in conjunction with a private firm in a manner substantially similar to the terms of the current GSAC lease. In 1968, the Authority entered into a five-year contract with Nederlander Associates (Nederlander) for the "full responsibility of booking, handling subscriptions in ticket sales, and *general management* of the [amphitheater]." *October 1968 Hearing, supra,* at 45A (emphasis added). The agreement further required Nederlander to "underwrite all costs [during the performance season] and . . . make available to the Authority one-third of [Nederlander's profits] at the end of the season." *Ibid.* Nederlander was also granted the right to operate concession stands at amphitheater performances. *Id.* at 48A. During Nederlander's inaugural performance season, the amphitheater hosted sixty night-time performances featuring "outstanding artists from the classical and

popular performing world." *Id.* at 66A. Nederlander events also included a regional talent show, daytime educational performances, a performance by the United States Army Field Band and Soldiers' Chorus, and a two-day jazz festival. *Id.* at 66A–67A. Over 300,000 people attended amphitheater performances in 1968. *Id.* at 66A.

The current GSAC lease agreement requires GSAC to operate the amphitheater in much same manner as Nederlander operated it in 1968. Although the GSAC agreement conveys a leasehold interest in the amphitheater, GSAC's use of the amphitheater is severely limited, and GSAC is contractually obligated to operate the amphitheater in accordance with its original purpose. Section 5.10(g) of the GSAC lease restricts the use of the amphitheater to the following activities:

> (a) for producing and presenting entertainment events or shows, including without limitation, commercial concerts of musical performers or comedians, artistic performances of symphonic music, ballet or opera, theatrical performances and cinemagraphic films, pre-recorded or simulcast video and audio productions;
>
> (b) for the holding or conducting of fairs and festivals;
>
> (c) as a center or location for educational conferences, seminars, corporate meetings, shareholder meetings, civic events, graduations or political fundraisers;
>
> (d) as a place for selling food, beverages (including alcoholic beverages . . .) and other merchandise; and
>
> (e) for any and all other lawful purposes which are directly related to the foregoing uses and purposes.

Additionally, the Authority retains the right to use the amphitheater annually, "consistent with past practices," for ten ethnic-heritage festivals, twenty admission-free performances, and a winter holiday celebration. GSAC is also required to make "reasonable best efforts" to provide "balanced programming" at the amphitheater. The lease contains a host of other provisions reinforcing that "the [a]mphitheater is a significant community asset to be operated in a reputable manner" and requiring GSAC to operate the amphitheater "consistent" with its past use. Thus, the terms of the GSAC agreement ensure that the amphitheater will continue to be operated as a public performing arts center.

Nevertheless, Holmdel identifies several aspects of the GSAC lease that it asserts fundamentally alter the Arts Center's use. Specifically, Holmdel notes that .Nederlander was prohibited from serving alcohol during performances and could not schedule performances during the Parkway's peak traffic periods—Friday and Sunday evenings during the summer. GSAC is not subject to those same limitations and may serve alcohol at performances and schedule events for any day of the week. Holmdel also emphasizes that, under the terms of the GSAC agreement, the amphitheater facilities will be enlarged and upgraded, further altering the amphitheater from its original design. Finally, Holmdel contends that the amphitheater was originally designed to function as a cultural and educational facility, not a commercial venue for popular artists.

Holmdel's characterization of the amphitheater's initial use is inaccurate. The amphitheater has always hosted popular performers, as well as educational and cultural events. Indeed, the 1968 season included multiple performances from "outstanding artists from the . . . popular performing world." *October Hearing, supra*, at 66A. Additionally, the GSAC lease ensures that the amphitheater will continue to be the site of cultural and educational events because the Authority is entitled to use the amphitheater for thirty-one public interest events per year and requires GSAC to present balanced programming.

Further, the question in this appeal is not whether there have been *any* operational changes since 1968. We are satisfied that the 1968 Legislature did not intend the amphitheater to be frozen in the state of operation and repair that existed in 1968. Such an interpretation would produce an absurd result. Instead, the relevant inquiry is whether the amphitheater's current use was contemplated by the 1968 Legislature when it grandfathered the Arts Center.

One of the Arts Center's original purposes was to generate revenue for the Authority. The Arts Center's construction was financed by issuing State-guaranteed bonds, to be repaid from

revenue generated by the Arts Center. The Arts Center was also expected to generate additional revenue that would be used to repay bonds that were issued to construct the Parkway. Since its birth, therefore, the Arts Center was intended to generate revenue for the Authority in addition to providing public access to the performing arts.

The 1968 Legislature was fully aware of the Arts Center's dual purpose. The first of the 1968 Amendments to the Highway Act did not include a provision grandfathering the Arts Center. *L. 1968, c. 348.* The Governor vetoed those amendments because they would "violate the specific covenant of the State with the bondholders," *Veto Message of Governor Richard J. Hughes With Respect to Senate Bill 493* (Sept. 19, 1968). The Legislature subsequently added the grandfather provision, evincing its recognition that the amphitheater should continue to be used to generate revenue for the Authority.

Holmdel's assertion that the amphitheater's current operation was not contemplated by the 1968 Legislature presumes that the Legislature did not intend for the amphitheater's operation to evolve and adapt as necessary to maintain profitability. That presumption is misguided. The amphitheater was intended to serve two purposes—providing access to the performing arts and generating revenue for the Authority. Renovations, contemporary programming, and alcoholic refreshments are all reasonable adaptations aimed at retaining the amphitheater's profitability.

The GSAC lease agreement thus serves the Authority's underlying purposes in creating the amphitheater, and the amphitheater is entitled to the Authority's statutory tax exemption. We are satisfied that the Legislature intended the amphitheater to be operated in much the same manner as it is currently operated by GSAC. In grandfathering the amphitheater, the 1968 Legislature expected that the amphitheater's operation would evolve as necessary to retain profitability. Although the amphitheater's programming and facilities have changed since 1968, those incremental and reasonable changes were in furtherance of the am-

phitheater's original purpose. The terms of the GSAC lease do not depart from that intended progression.

### B.

 The reception center presents a different set of circum-. stances than the amphitheater. First, there were no public reception facilities or services at the Arts Center in 1968. *1988 Senate Hearing, supra,* at 38–39. Although the Celebrity House was converted into a reception center in 1972, our review of the Arts Center's history reveals that in 1968 the Celebrity House was used primarily to host community botany classes. *May 1968 Hearing, supra,* at 69A–70A. In 1968, the Authority had not dedicated any facilities exclusively to reception services and no reception services were available to the general public.

Nor is there any indication that the 1968 Legislature, which reluctantly grandfathered the $6.7 million amphitheater, contemplated the subsequent construction of a $6.4 million commercial reception center. In fact, the opposite is true. The 1968 Legislature unequivocally intended to prevent "repetitions" of projects like the amphitheater and sought to "bar the door to similar projects in the future." *Id.* at 2 (statement by Senator Matthew J. Rinaldo, sponsor of 1968 Amendments).

As already noted, the Senate Special New Jersey Highway Investigation Committee was convened in 1988 to investigate the reception center. The Committee concluded that the Authority had exceeded its statutory powers in the construction of the reception center and that the reception center was an "ill-executed" project that could have been avoided with "appropriate legislative input." *Second Interim Report of Senate Special New Jersey Highway Authority Investigation Committee 30* (Oct. 1989). The Committee predicted that an increase in toll prices would be necessary to sustain the reception center because the Authority had constructed the reception center without developing any marketing or feasibility strategies. *Ibid.* Committee members also criticized the reception center because it extended the Arts Cen-

ter's facilities and services "far beyond what the Arts Center [was then] doing." *1988 Senate Hearing, supra,* at 70 (statement by Senator Gabriel M. Ambrosio).

Those characterizations of the reception center comport with our review of its design and construction. The Legislature enacted the 1968 Amendments with the intention of preventing "repetitions" of projects like the amphitheater. We cannot agree that the Legislature simultaneously contemplated and approved of the construction of a multi-million dollar reception center. Because there were no public reception facilities or services at the Arts Center in 1968, the reception center was not a reasonable and incremental extension of "existing facilities or activities," *N.J.S.A.* 27:12B–5.1 (repealed). Unlike the amphitheater's gradual evolution, the reception center was an unexpected project, without any reasonable nexus to the Arts Center's original purpose, and beyond the intended scope of the tax exemption. Accordingly, it is not entitled to tax immunity.

### C.

The Authority nevertheless contends that the 2003 Merger Legislation, *L.* 2003, *c.* 79, which repealed the Highway Act and merged the Highway Authority into the Turnpike Authority, evidences the Legislature's intent to exempt the Arts Center from taxation.

The Merger Legislation was prompted by Governor McGreevey's concern that New Jersey was facing a "fiscal crisis." *See Executive Order No. 15* (Mar. 26, 2006) (discussing reasons for consolidation). In 2002, Governor McGreevey created the Toll Road Consolidation Study Commission to investigate "the fiscal prudence of maintaining three separate instrumentalities to operate [New Jersey's] toll roads." *Ibid.* The Governor further explained that, "[I]n light of the State's serious fiscal crisis it has become necessary to reexamine whether the functions of these authorities to acquire, construct, administer, operate and maintain

their respective toll roads are duplicative and can be consolidated to promote operational efficiency and economic savings." *Ibid.*

In 2003, the Commission suggested that the Turnpike Authority and the Highway Authority be merged, recommending that the Turnpike Authority acquire the Highway Authority. *Report of the New Jersey Toll Road Consolidation Study Commission* (Feb. 14, 2003) [hereinafter *Toll Road Report*]. The Commission estimated that the consolidation would result in a $198 million savings. *Ibid.* The Commission also noted that consolidation would "achieve administrative economies and operational efficiencies," "pool capital planning resources," and "provide for sorely needed toll road capital improvements." *Ibid.* Acting on the Commission's recommendations, the Legislature passed the Merger Legislation in 2003. The Legislature declared that "[t]he abolishment of the New Jersey Highway Authority and the transfer of its functions to the New Jersey Turnpike Authority will permit improved transportation planning, facilitate more efficient operations, improve the capital budget process and achieve administrative economies." *L.* 2003, *c.* 79, § 1(b).

Regarding the Arts Center, the Merger Legislation transferred ownership to the Turnpike Authority and amended the definition of "highway project" to include "the Garden State Arts Center, *as transferred to* the [Turnpike] Authority." *L.* 2003, *c.* 79, § 8 (amending *N.J.S.A.* 27:23-4) (emphasis added). The Merger Legislation further provided that "the Legislature reaffirms that all existing facilities and property, and their operations, and management, of the [Turnpike Authority] and of the New Jersey Highway Authority, *as transferred to* the authority, are deemed public and essential governmental functions and are exempt from local taxes or assessments." *L.* 2003, *c.* 79, § 23 (amending *N.J.S.A.* 27:23-12) (emphasis added).

The Authority advances two arguments regarding the Merger Legislation. First, the Authority contends that the 2003 Merger Legislation demonstrates the 1968 Legislature's intent to exempt the Arts Center from taxation. The Authority, therefore, urges

this Court to infer from the 2003 Merger Legislation that the 1968 Amendments provide tax immunity to the Arts Center for all years under appeal, including years prior to the Merger Legislation's enactment. Second, the Authority argues that the Merger Legislation created a new, prospective tax exemption that applies for all years after 2003.

We disagree. In cases where our courts have looked to subsequent legislation as extrinsic, non-conclusive evidence of earlier legislative intent, those inquiries have been limited to circumstances "where a *doubtful meaning* of a former statute [is] rendered certain by subsequent legislation." *Boyd v. Marini,* 132 *N.J.Super.* 324, 328, 333 *A.*2d 559 (App.Div.1975) (emphasis added) (alteration in original) (quotation omitted). Here, however, the meaning of the 1968 Amendments is clear and need not be "rendered certain by subsequent legislation." *Ibid.* The language and history of the 1968 Amendments provide conclusive evidence of the statute's intended meaning, and we need not consult the Merger Legislation—enacted more than thirty years later—for clarification.

The Authority's second argument, with which Justice Wallace agrees in his dissent/concurrence, is that the Merger Legislation created a new, prospective tax exemption. However, that contention is not supported by the text or history of the Merger Legislation. Indeed, *N.J.S.A.* 27:23–12, which defines the Arts Center's tax immunity, states, "[The Merger Legislation] *reaffirms* [that] all existing facilities and property ... are tax exempt." (emphasis added). The word "reaffirm" literally means to "affirm *again.*" *Webster's Third New International Dictionary* 1890 (3d ed. 1971) (emphasis added). Thus, it is incongruous to conclude that the Legislature intended to create an entirely *new* tax exemption but chose to use the word "reaffirm," which implies confirmation of a *past* condition, to create that exemption. Additionally, interpreting *N.J.S.A.* 27:23–12 to create a prospective tax immunity would render meaningless the word "reaffirm." Because the 1968 Amendments defined the scope of the Arts Cen-

ter's tax immunity prior to 2003, the Merger Legislation's language purports only to "reaffirm" the tax exemption that already existed under the 1968 Amendments.

Further, *N.J.S.A.* 27:23–4, which categorizes the Arts Center as a "highway project" of the Turnpike Authority, declares that a " '[h]ighway project' means . . . *maintenance* of the . . . Garden State Arts Center, *as transferred* to the Authority." (emphasis added). The phrase "as transferred" qualifies the Arts Center's categorization as a highway project. The phrase does not imply an enlargement of the Arts Center's statutory purpose. Rather, it suggests that the Authority's mandate regarding the Arts Center was transferred to the Turnpike Authority without enlarging or altering it. That interpretation is bolstered by the Legislature's use of the word "maintenance," which suggests that the Merger Legislation authorized the Turnpike Authority only to retain the Arts Center's status quo. In sum, the Merger Legislation's language indicates that the Legislature intended to transfer the Arts Center to the Turnpike Authority without creating a new tax immunity or enlarging the Arts Center's statutory purpose.

The history and purpose of the Merger Legislation further support that conclusion. The Merger Legislation was not intended to enlarge or alter the Highway Authority's mandate. Instead, its sole purpose was to improve administrative economies and operational efficiencies. The impetus for the Merger Legislation was the State's fiscal crisis and the Commission's suggestion that consolidation would save the State $198 million. *Toll Road Report, supra.*

Finally, in support of the argument that the Merger Legislation created a prospective tax exemption, the dissent/concurrence presents an additional argument. That opinion states that because the Legislature enacted the Merger Legislation while this appeal was pending, the Merger Legislation was "intended to clarify the tax issue that was pending before the Tax Court." *Post* at 101, 918 A.2d at 619 (Wallace, J., dissenting/concurring). However, despite the Merger Legislation's well-documented history, there is no

evidence that the Legislature considered the Arts Center's tax immunity. Rather, as already noted, the Merger Legislation's exclusive purpose was to mitigate the State's fiscal crisis by reducing administrative inefficiencies. *See N.J.S.A.* 27:23–41 (declaring purpose of Merger Legislation). Thus, that inference, although plausible in view of the temporal proximity between this appeal and the enactment of the Merger Legislation, is not supported by the legislative history. Indeed, the dissent/concurrence does not cite any extrinsic evidence demonstrating that the Legislature considered the Arts Center's tax immunity when it enacted the Merger Legislation.

Because there is no indication in the Merger Legislation's text or history that the Legislature intended to enlarge the Arts Center's tax exemption, we decline to infer that the Merger Legislation created a new, prospective tax immunity.

## V.

Government tax immunities serve an important role in our society. They facilitate the provision of essential government services and create incentives for private entities to serve the public welfare. However, unauthorized exemptions from local property taxation can unduly burden particular communities that, by no choice of their own, are host to government agencies. It is therefore imperative that governmental immunities be subject to searching judicial review.

Having carefully considered the legislative intent regarding the Authority's statutory tax immunity, we hold that the amphitheater and attendant facilities are exempt from local property taxation. However, the reception center is beyond the scope of the Authority's tax exemption and is subject to taxation for all years under appeal.

We therefore reverse in part, affirm in part, and remand for an assessment of the Authority's tax liability consistent with our holding.

Justice WALLACE, JR., concurring in part and dissenting in part.

Except for the portion that rejects a prospective tax exemption, I concur with the majority opinion. I agree with the New Jersey Turnpike Authority's (Authority) position that the New Jersey Turnpike Authority Act (Merger Legislation or Act) created a new, prospective tax exemption that applies for· all years after 2003.

As the majority notes, "[t]he Merger Legislation was prompted by Governor McGreevey's concern that New Jersey was facing a 'fiscal crisis.'" *Ante* at 95, 918 *A.*2d at 615. As a result, the Legislature amended the Highway Authority Act to include the PNC Bank Arts Center (Arts Center) in the definition of "[h]ighway project," which is defined as "the acquisition, operation, improvement, management, repair, construction, . . . and maintenance of the New Jersey Turnpike and of the Garden State Parkway, . . . and of the Garden State Arts Center, as transferred to the authority." *L.* 2003, *c.* 79, § 8 (codified as amended at *N.J.S.A.* 27:23–4). The Legislature also amended the Act to include "highway projects" as a subset of tax-exempt "[t]ransportation project[s]." *L.* 2003, *c.* 79, §§ 8, 23 (codified as amended at *N.J.S.A.* 27:23–4, –12). Further, the Act authorized the Authority "to contract with any person . . . desiring the use of any part [of a highway project] . . . for placing thereon . . . stores, hotels, and restaurants, offices, entertainment facilities, or for any other purpose," *L.* 2003, *c.* 79, § 22 (codified as amended at· *N.J.S.A.* 27:23–9), and to decide whether "[t]o transfer, sell, dispose of, or otherwise relinquish all right, title, or interest in the Garden State Arts Center," *L.* 2003, *c.* 79, § 9 (codified as amended at *N.J.S.A.* 27:23–5(u)).

The Legislature expressly declared that:

The exercise of the powers granted by this act will be in all respects for the benefit of the people of the State, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions, and as *the operation and maintenance of transportation projects and other property by the Authority will constitute the performance of essential governmental functions,*

*the Authority shall not be required to pay any taxes or assessments upon any transportation project or any property acquired or used by the Authority under the provisions of this act or upon the income therefrom, and any transportation project and any property acquired or used by the Authority under the provisions of this act and the income therefrom, and the bonds issued under the provisions of this act, their transfer and the income therefrom (including any profit made on the sale thereof) shall be exempt from taxation. The Legislature reaffirms that all existing facilities and property, and their operations, and management, of the authority and of the New Jersey Highway Authority, as transferred to the authority, are deemed public and essential governmental functions and are exempt from local taxes or assessments.*

[*L.* 2003, *c.* 79, § 23 (codified as amended at *N.J.S.A.* 27:23–12) (emphasis added).]

The Legislature in clear, plain language "reaffirm[ed] that all existing facilities and property ... of the ... Authority, as transferred to the authority, are deemed public and essential governmental functions and are exempt from local taxes or assessments." *Ibid.* Despite that clear language, the majority reads the phrase "as transferred to the authority" to mean that "the Legislature intended to transfer the Arts Center to the Turnpike Authority without creating a new tax immunity or enlarging the Art Center's statutory purpose." *Ante* at 98, 918 *A.*2d at 617. I cannot agree.

At the time the Legislature passed the Merger Legislation, the Authority was continuing to challenge any attempt by Holmdel Township (Holmdel) to impose taxes on the Arts Center. The Appellate Division had also remanded to the Tax Court to determine "whether the use of the reception center under the Bott agreement is too far removed from the Legislature's initially-contemplated use to warrant tax immunity." *Ante* at 85, 918 *A.*2d at 609 (citation omitted). Thus, the tax issue was before the Tax Court when the Legislature passed the Merger Legislation.

In my view, the Legislature intended to clarify the tax issue that was pending before the Tax Court and did so by passing the Merger Legislation. The Legislature declared that the Arts Center was a highway project and that any property used by the Authority under the provisions of the Merger Legislation "shall be exempt from taxation." *L.* 2003, *c.* 79, § 23 (codified as amended at *N.J.S.A.* 27:23–12). After making that declaration, the Legislature then reinforced its intention by stating that it "reaffirms that

all existing facilities and property ... of the ... Authority ... are deemed public and essential governmental functions and are exempt from local taxes or assessments." *Ibid.* The Legislature could not have been clearer in the Merger Legislation in declaring its intention that the Arts Center was exempt from taxes.

The majority takes a different view and states that "it is incongruous to conclude that the Legislature intended to create an entirely new tax exemption but chose to use the word 'reaffirm,' which implies confirmation of a past condition, to create that exemption." *Ante* at 97, 918 *A*.2d at 616. As noted above, at the time the Legislature passed the Merger Legislation, the Authority had never paid taxes to Holmdel for the Arts Center and had challenged Holmdel's attempt to impose taxes. Under those circumstances, the Legislature's use of the word "reaffirm" was intended to maintain the then existing, but disputed, tax exemption.

Finally, in disagreeing with my position, the majority notes that "the Merger Legislation's exclusive purpose was to mitigate the State's fiscal crisis by reducing administrative inefficiencies." *Ante* at 99, 918 *A*.2d at 617 (citation omitted). It seems obvious that the majority's rejection of a tax exemption for the Arts Center will have the opposite effect. Clearly, by imposing taxes for the first time on the Authority, it will raise the Authority's expenses and create new financial obligations.

I conclude that, once the Merger Legislation became effective in 2003, the Arts Center, including the reception center and the amphitheater, was tax exempt.

Justice RIVERA–SOTO joins in this opinion insofar as Justice WALLACE would confer tax-exempt status on the reception center.

JUSTICE RIVERA–SOTO, concurring in part and dissenting in part.

The PNC Bank Arts Center (Arts Center), a facility originally owned by the New Jersey Highway Authority and now owned by

its statutory successor agency the New Jersey Turnpike Authority (Authority),[1] consists of two major parts: a performance amphitheater and a reception center.[2] Each of the amphitheater and the reception center is operated by a private entity under contract with the Authority. Starting with the 1996 tax year, the Township of Holmdel (Holmdel), where the Arts Center is located, sought to impose real estate tax liability on the entire Arts Center. It is that effort, placed in the context of the rather tortured history of this controversy, which leads to the disparate results advanced. It is my view that the entirety of the Arts Center complex is tax-exempt. Therefore, to the extent the majority grants tax-exempt status to the amphitheater portion of the Arts Center, I concur. However, to the extent the majority denies tax-exempt status to the reception center portion of the Arts Center, I dissent.

## I.

Originally, Holmdel asserted that the entire Arts Center was subject to property tax assessment for the years 1996, 1997, and 1998. In a comprehensive oral decision rendered on January 22, 1999, Judge Francine I. Axelrad, Judge of the Tax Court, straight-

---

[1] The New Jersey Highway Authority was created in 1952 pursuant to the New Jersey Highway Authority Act, *N.J.S.A.* 27:12B–1 to –26. The New Jersey Highway Authority Act was repealed by *L.* 2003, *c.* 79, § 49, and its operative provisions were merged into the New Jersey Turnpike Authority Act, *N.J.S.A.* 27:23–1 to –47. The session law effecting this merger, *L.* 2003, *c.* 79, § 1 to § 50, is commonly referred to as "the merger legislation," and became effective July 9, 2003, the date of transfer of authority from the Highway Authority to the Turnpike Authority. *L.* 2003, *c.* 79, § 50; *N.J.S.A.* 27:23–4 (defining "Transfer Date").

[2] The Arts Center as a whole formerly was known as the "Garden State Arts Center," a designation that remains embedded in the statutory scheme. *N.J.S.A.* 27:23–4 (defining "Garden State Arts Center" as "the Garden State Arts Center, sometimes referred to as the PNC Bank Arts Center, a highway project of the authority"). In common parlance, the PNC Bank Arts Center is understood to encompass the amphitheater or performance portion of the Arts Center. The reception center is named separately, in honor of the late Robert Baumle Meyner (1908–1990), who served as New Jersey's Governor from 1954 to 1962.

forwardly explained that "[t]he ultimate issue that the Court must resolve is the tax status of the Arts Center." Judge Axelrad explained the relevant analysis thusly:

(1) whether the Arts Center is a ["]project["] as originally authorized in the 1952 Highway Authority Enabling Statute,[3] and therefore exempt from taxation under *N.J.S.A.* 27:12B–6 [(repealed by *L.* 2003, *c.* 79, § 49)]; (2) if not, whether the Legislature subsequently approved then ratified the continued construction and operation of the Arts Center by the Authority, and is, therefore, exempt from taxation under the above-mentioned statute; and (3) even if it were exempt, does the privatization of the Arts Center, does the use of the Arts Center or the projected use of the Arts Center pursuant to the contract or lease with [a private party] change the nature of the Arts Center and change or somehow remove it from being a ["]project,["] therefore vitiating the tax status of the Arts Center.

She concluded that "[b]ased upon the case law, the statutes, [and] the [l]egislative [h]istory, it is clear to this Court that the Arts Center is a [']project,['] [that] it serves a public purpose by being a [']project['] within the ambit of the statute which serves a public purpose, [and] that it is expressly exempt from taxation pursuant to *N.J.S.A.* 27:12B–16 [(repealed by *L.* 2003, *c.* 79, § 49)]."

The Appellate Division rejected Judge Axelrad's reasoning and conclusion. *Twp. of Holmdel v. N.J. Highway Auth.*, 329 *N.J.Super.* 410, 412, 748 *A.*2d 128 (App.Div.2000). Focusing on the nature of the leases between the Authority and private entities for the separate operation of the amphitheater and the reception center, the panel explained that "the fundamental issue here is whether the operation and activities of the Arts Center complex under the [private party] leases are within 'the boundaries of the authority delegated by the Legislature to the agency' and whether the use is within 'the terms in which the Legislature bestowed the [tax] immunity.'" *Id.* at 420, 748 *A.*2d 128 (quoting *Borough of Moonachie v. Port of N.Y. Auth.*, 38 *N.J.* 414, 422–23, 185 *A.*2d 207 (1962)). Concentrating on the 1968 amendments to the New Jersey Highway Authority Act,[4] the Appellate Division disagreed

---

[3] *L.* 1952, *c.* 16, § 1 to § 27, as codified at *N.J.S.A.* 27:12B–1 to –26, and repealed by *L.* 2003, *c.* 79, § 49.

[4] *L.* 1968, *c.* 348, § 1 and § 2, as modified by *L.* 1968, *c.* 441, § 1, and repealed by *L.* 2003, *c.* 79, § 49.

with Judge Axelrad's findings and concluded that, on the record developed to that point, it could not determine with certainty whether the use of each of the amphitheater and reception center was a "project" meriting a tax exemption. *Id.* at 431, 432, 748 *A.2d* 128. The panel thus remanded the case to "flesh out the record[.]" *Id.* at 433, 748 *A.2d* 128.

On remand, the parties expanded the temporal scope of the litigation to cover the original tax years 1996, 1997, and 1998 and the additional tax years 2000, 2001, 2002, and 2004.[5] Tax Court Judge Kuskin [6] determined that the entire Arts Center complex— both the amphitheater and the reception center—lost its tax-exempt status because of a change in the nature of the operations of the Arts Center as a whole, and that the merger legislation, *N.J.S.A.* 27:23-4, did not reinstate or revive that exemption. *Twp. of Holmdel v. N.J. Highway Auth.*, 22 *N.J.Tax* 428, 451-52, 464 (Tax 2005). Judge Kuskin ordered that (1) the amphitheater was tax-exempt for tax year 1996 but not for the tax years 1997, 1998, 2000, 2001, 2002, and 2004, and (2) the reception center was not tax-exempt for any of the tax years at issue. *Id.* at 466. The Appellate Division affirmed. *Twp. of Holmdel v. N.J. Highway Auth.*, 388 *N.J.Super.* 36, 905 *A.*2d 900 (App.Div.2006).

## II.

The majority disagrees in part with the conclusions reached by Judge Kuskin and as affirmed by the Appellate Division. Distinguishing between the amphitheater and the reception center, the majority concludes that "the amphitheater remains tax exempt" but that "the reception center is subject to taxation." *Ante,* 190 *N.J.* at 78, 918 *A.*2d at 605 (2007). Thus, the majority orders a "remand for a tax assessment of the reception center" indepen-

---

[5] The record does not disclose a reason for the omission of the tax years 1999 or 2003 from the chronological continuum.

[6] In the interim, Judge Axelrad was assigned to the Appellate Division, where she continues to serve.

dent of the amphitheater. *Id.* at 78, 918 *A.*2d at 605. As a result of the majority's holding, the Authority is liable to Holmdel for real estate taxes on the reception center for the tax years 1996, 1997, 1998, 2000, 2001, 2002, 2004, and all tax years thereafter.

Justice Wallace, concurring in part and dissenting in part, agrees with the majority that the amphitheater always has been and should continue to be tax-exempt. *Ante*, at 100, 918 *A.*2d at 618. However, Justice Wallace concludes that, by operation of the merger legislation, the entire Arts Center—including the reception center—should be tax-exempt effective the 2004 tax year and for all following years. *Id.* at 102, 918 *A.*2d at 619. Thus, Justice Wallace would hold the Authority liable to Holmdel for real estate taxes on the reception center but limited exclusively to the tax years at issue in this litigation and preceding the merger legislation: 1996, 1997, 1998, 2000, 2001, and 2002.

## III.

To the extent the majority concludes that the amphitheater portion of the Arts Center is exempt from real estate tax liability, I concur. However, to the extent the majority finds that the reception center portion of the Arts Center is subject to real estate taxation by Holmdel, even if such liability is temporally limited in accordance with Justice Wallace's analysis, I disagree. This disagreement, then, is limited to the retroactive and prospective tax treatment to be accorded the reception center portion of the Arts Center.

## A.

I return to Judge Axelrad's thoughtful statutory analysis in 1999, bearing in mind that she rendered her decision five years before the merger legislation was adopted, the same legislation that leads Justice Wallace to conclude that the reception center is tax-exempt. I agree with Judge Axelrad's plain reading of *N.J.S.A.* 27:12B–5.1 (repealed by *L.* 2003, *c.* 79, § 49), which

provides that "[t]he *continued* operation of existing facilities or activities by the authority shall not be affected by the provisions of [the 1968 statutory amendments]." (emphasis supplied). There is no doubt that the operations of both the amphitheater and the reception center have *continued* from their inception prior to the 1968 amendments through the present, albeit in a greatly expanded role. Similarly, under the merger legislation, *"all existing facilities and property, and their operations, and management,* of the authority and *of the New Jersey Highway Authority,* as transferred to the authority, are deemed public and essential governmental functions and *are to be exempt from local taxes and assessments." N.J.S.A.* 27:23–12 (emphasis supplied). Thus, at its core, this case presents a simple question of statutory construction.

The manner in which we address that task is clear: " '[W]hen interpreting a statute, our overriding goal must be to determine the Legislature's intent.' " *SASCO 1997 NI, LLC v. Zudkewich,* 166 *N.J.* 579, 586, 767 *A.*2d 469 (2001) (quoting *State, Dep't of Law & Pub. Safety v. Gonzalez,* 142 *N.J.* 618, 627, 667 *A.*2d 684 (1995)); *see also L.W. v. Toms River Reg'l Schs. Bd. of Educ.,* 189 *N.J.* 381, 400, 915 *A.*2d 535 (2007) ("Because that question entails statutory interpretation, we begin with the statute's plain language—our polestar in discerning the Legislature's intent.") (citing *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005)). We have explained that " '[o]rdinarily, the language of the statute is the surest indicator of the Legislature's intent.' " *SASCO 1997 NI, LLC v. Zudkewich, supra,* 166 *N.J.* at 586, 767 *A.*2d 469 (quoting *Alan J. Cornblatt, P.A. v. Barow,* 153 *N.J.* 218, 231, 708 *A.*2d 401 (1998)). When, as here, " 'the language is plain and clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms.' " *Ibid.* (quoting *State, Dep't of Law & Pub. Safety v. Bigham,* 119 *N.J.* 646, 651, 575 *A.*2d 868 (1990)). "[W]e also consider the overall legislative scheme[,]" *ibid.* (citing *Fiore v. Consol. Freightways,* 140 *N.J.* 452, 466, 659 *A.*2d 436 (1995)), because " '[o]ur task is to harmonize the individual sections and read the statute in the way that is most

consistent with the overall legislative intent[,]'" *ibid.* (quoting *Fiore, supra,* 140 *N.J.* at 466, 659 *A.*2d 436).

Judge Axelrad originally explained that, albeit in a more limited form than at present, the Arts Center existed as of the 1968 amendments to the New Jersey Highway Authority Act, specifically the adoption of *N.J.S.A.* 27:12B–5.1 (repealed by *L.* 2003, *c.* 79, § 49). She noted that "[e]ven if the term 'project' as defined in the original act may not have contemplated the Arts Center, ... a plain reading of *N.J.S.A.* 27:12B–5.1 [(repealed by *L.* 2003, *c.* 79, § 49)] and the Commission hearings surrounding its enactment[ ] suggest that the Legislature ratified the continued construction and operation of the Arts Center by the Authority." She reasoned that "by ratifying the Arts Center as a [']project['] under [*N.J.S.A.*] 27:12B–5.1, it automatically followed, without having to mention it in the statute, that ... the [']project['] is exempt from taxation pursuant to the express language of *N.J.S.A.* 27:12B–16 [(repealed by *L.* 2003, *c.* 79, § 49)]."

I cannot improve on Judge Axelrad's analysis, reasoning, or conclusions, save to further supplement it with the unambiguous language of the merger legislation adopted five years after she reached her decision. I too subscribe to the view that the Arts Center—including its component parts of an amphitheater and a reception center—constitutes a "project" as defined in the now-repealed *N.J.S.A.* 27:12B–3(d) (defining "project" to include "such adjoining park or recreational areas and facilities directly related to the use of the express highway, superhighway or motorway as the authority, with the concurrence of the Department of Environmental Protection, shall find to be necessary and desirable for the convenience and comfort of users of the highway project and feasible for development pursuant to this act") (repealed by *L.* 2003, *c.* 79, § 49). As the majority notes, "[c]onstruction of the Arts Center was completed in 1968." *Ante,* at 79, 918 *A.*2d at 606. Hence, the Arts Center was, at that point, exempt from all forms of taxation. *N.J.S.A.* 27:12B–16 (repealed by *L.* 2003, *c.* 79, § 49). Judge Axelrad noted, and again I entirely agree, that after the

Arts Center was constructed, the Legislature adopted the 1968 amendments to the New Jersey Highway Authority Act, specifically *N.J.S.A.* 27:12B–5.1 (repealed by *L.* 2003, *c.* 79, § 49), which plainly provided that "[t]he *continued* operation of existing facilities or activities by the authority shall not be affected by the provisions of [the 1968 statutory amendments]." (emphasis supplied). Thus, at least until the 2003 repeal of the New Jersey Highway Authority Act and the adoption of the merger legislation, the *entire* Arts Center—including the amphitheater and reception center—was tax-exempt.

This conclusion is further supported by the explicit language used by the Legislature when it consolidated all highway matters under the New Jersey Turnpike Authority pursuant to the merger legislation. *L.* 2003, *c.* 79, § 1 to § 44, as codified at *N.J.S.A.* 27:23–1 to –47. In adopting the merger legislation, which supplanted the earlier statutory scheme concerning the New Jersey Highway Authority, the Legislature statutorily defined the Arts Center as "a highway project of the authority." *N.J.S.A.* 27:23–4. It also defined a "highway project" to specifically include "the Garden State Arts Center" as well as any "adjoining park and recreational areas and facilities, directly or indirectly related to the use of a transportation project as the authority shall find to be necessary and desirable[.]" *N.J.S.A.* 27:23–4. Finally, the merger legislation amended the exemption from taxation section of the New Jersey Turnpike Authority Act to "reaffirm[ ] that all existing facilities and property, and their operations, and management ... of the New Jersey Highway Authority ... are exempt from local taxes or assessments." *N.J.S.A.* 27:23–12. The language used by the Legislature is telling: it "reaffirms" the tax-exempt status of the Arts Center, thereby making clear that the Legislature all the while intended the Arts Center and its "operations[ ] and management" to be tax-exempt.

B.

Judge Axelrad also explained that, "because the Arts Center is a ['project,['] it should be exempt from taxation pursuant to the

express language of *N.J.S.A.* 27:12B–16 [(repealed by *L.* 2003, *c.* 79, § 49)], unless something has occurred ... which would vitiate or remove that express ability to obtain a tax exemption." Relying on the "basic principle" that "property employed primarily for a public use does not lose immunity [from taxation] because the agency *incidentally* derives some private business income from it[,]" *Borough of Moonachie v. Port of N.Y. Auth.*, 38 *N.J.* 414, 426–27, 185 *A.*2d 207 (1962), Judge Axelrad found that the Arts Center's ability to offer entertainment and recreational activities clearly conferred a public benefit. Properly dismissing the objection that the Arts Center was earning income as a result of these activities, she noted that "monetary considerations ... do not change the character, the fact that the Garden State Arts Center was used for public use, for public benefit ... and it's continuing to be used for those purposes after [the agreements with the private parties were executed]." Adopting the argument advanced by the Authority, Judge Axelrad explained that the expansion of the amphitheater and the reception center, and the engagement of private parties to run these facilities, was "an enhancement of services and of the facilities, as well as an enhancement of revenues that can be used for other purposes by the Authority for recreational uses for the benefit of the public, which is the intended recipient under the Act."

In sum, Judge Axelrad concluded that "the Arts Center as a project of the Authority, serves a public purpose and that ... public purpose is not lost by the fact that it's privatized[.]" Judge Axelrad concluded, and I concur, that "the concept of a public purpose is a broad one" and that, in the circumstances presented, the activities at the Arts Center's amphitheater and reception center provide a public use and should be tax-exempt. *See, e.g., S. Jersey Transp. Auth. v. City of Pleasantville*, 312 *N.J.Super.* 438, 712 *A.*2d 215 (App.Div.1998) (holding, under parallel statutory scheme, that monies received from private parties for use of billboards placed on authority land adjacent to highway nonetheless were statutorily exempt from taxation).

## C.

Because Judge Axelrad rendered her decision in 1999, she did not have the opportunity to speak to the merger legislation and its effect on this controversy. To the extent Justice Wallace relies on the merger legislation to conclude that the entire Arts Center is exempt from taxation, I concur. However, in my view, the merger legislation reinforces my earlier conclusion that the entirety of the Arts Center—amphitheater and reception center included—was tax-exempt from its inception. Thus, because Justice Wallace only applies the tax exemption to the reception center prospectively, I cannot join in that portion of his opinion that does not retroactively grant a tax exemption for the reception center.

## IV.

To sum up, the majority distinguishes between the amphitheater and reception center portions of the Arts Center, and holds that the amphitheater portion is exempt from taxation but that the reception center is subject to taxation. Justice Wallace agrees that the amphitheater portion is tax-exempt from its inception, but asserts that, by virtue of the merger legislation, the reception center acquired tax-exempt status as of tax year 2004. I concur with those parts of the majority opinion and Justice Wallace's concurrence that grant tax-exempt status to the amphitheater portion of the Arts Center. However, to the extent the majority both retroactively and prospectively—and, to a lesser retroactive extent only, Justice Wallace—deny tax-exempt status to the reception center portion of the Arts Center, I dissent.

*For reversal in part & remandment (Part IV.A)*—Chief Justice ZAZZALI and Justices LONG, WALLACE, RIVERA–SOTO, and HOENS—5.

*For affirmance in part & remandment (Part IV.B)*—Chief Justice ZAZZALI and Justices LONG, WALLACE and HOENS—4.

*For reversal & remandment (Part IV.B)*—Justice RIVERA-SOTO—1.

*For affirmance in part & remandment (Part IV.C)*—Chief Justice ZAZZALI and Justices LONG and HOENS—3.

*For Reversal & remandment (Part IV.C)*—Justices WALLACE and RIVERA-SOTO—2.