NUGENT, J.T.C.
The property at issue is the site of a public hospital formerly known as Bergen Pines constructed by the County of Bergen (county) in or around the early to mid 1900s. Historically, the property was not subject to local property taxes based on N.J.S.A. 54:4-3.3 which provides an exemption for county owned property put to public use. In 1997, the county elected to transition the public hospital to provide management, maintenance and operation of the facility by a for-profit, third-party health care management firm. The hospital was renamed Bergen Regional Medical Center.
The property continued to be designated as exempt on the tax rolls. Beginning in or around 2001, the manager entered into contracts to lease space within the hospital buildings to the Ho Ho Kus School of Secretarial and Medical Services, physicians, and other service providers. The assessor for the Borough of Para-mus placed a partial assessment on the property in 2005 meant to tax those spaces within the hospital buildings leased by the manager to for-profit service providers. The Borough of Paramus (plaintiff) filed a tax appeal in 2008, and for later years, challenging the exempt status of the hospital and seeking to increase both the non-taxed assessment on the exempt portion of the property and the taxed assessment on the hospital’s leased spaces. All defendants named herein[2] filed counterclaims seeking judgment that the property is wholly exempt pursuant to N.J.S.A 54:4-3.3.
This matter is before the court on the parties’ cross-motions for summary judgment on the exemption claim. The motions present two issues: (1) whether operation of the county-owned hospital by a for-profit manager invalidates the exemption, and (2) if it does not, whether the hospital spaces leased to third-party service providers constitute a private use in violation of N.J.S.A. 54:4-3.3.
The public hospital was established by Bergen County to provide care for the sick, mentally ill and aged population otherwise *218 unable to afford the cost of hospitalization. N.J.S.A 30:4-68; N.J.S.A. 30:9-12.1; N.J.S.A 30:9-12.8. Based on the undisputed facts the for-profit manager operates the hospital within the public purpose set forth in the statutes. Accordingly, the court finds that the exemption is unaffected by the mere act of leasing county owned property to a for-profit manager. However, the use of the hospital is limited by the scope of the county hospital statutes if the exemption is to apply. The facts fail to define the nature of the services provided in the leased spaces and the connection between those services and the hospital population which compels denial of the motions.
Further, despite arguments raised by both parties, the court finds that the assessment may not be apportioned between the publicly and privately used portions of a county owned building under N.J.S.A 54:4-3.3, and, as well, that the Leasehold Taxing Act, N.J.S.A 54:4-2.3, has no application to these facts. Finally, the position adopted by defendants that the exemption remains unaffected whether or not the leased spaces constitute private uses since the percentage of space occupied is de minimus in nature must await further fact finding.

Procedural History

The borough tax records list the hospital property as Block 6402, Lot 1 and Lot 1, Qualifier X[3] (collectively the subject property). Qualifier X consists of some or all of the spaces within the buildings located on Lot 1 leased to the third-party service providers. Those spaces have not yet to date been identified with any degree of specificity by plaintiff borough (plaintiff). Lot 1 is exempt pursuant N.J.S.A 54:4-3.3 as county owned property,[4] Qualifier X is not.
Plaintiff filed petitions of appeal with the Bergen County Board of Taxation (Board) for tax year 2008 to remove the exemption for Lot 1 and to increase the assessments on Lot 1 and on Qualifier X. *219 The Board affirmed without prejudice the exemption as well as the taxed assessment. Thereafter, plaintiff filed direct Complaints with the Tax Court for 2008 through 2011 seeking the same relief. In each case, defendants filed an Answer and Counterclaim for a judgment of exemption for both lots or to reduce the taxed assessment. Defendants county and the BCIA (county defendants) filed for partial summary judgment on the exemption issue, in which defendants Solomon and BRMCLP have joined, and plaintiff cross-moved for summary judgment.[5] As a result of defects contained in plaintiffs papers defendants requested that the court deem admitted those facts contained within defendant’s motion papers for the purpose of the motions.[6] Even if the court were to do so, as noted, the matter is not ripe for summary judgment.
The court finds the following facts have been established for the purpose of this motion through certifications with annexed exhibits filed by the parties.

Transition of public hospital to private management

The subject property, located at 230 East Ridgewood Avenue, Paramus, is comprised of approximately 62 acres of land and 22 buildings. The public hospital on the property, previously known as Bergen Pines, has been owned by the county for over 80 years. Now known as Bergen Regional Medical Center, the hospital is licensed for 1185 beds which serve psychiatric care, long-term care and acute care medical needs. The smallest service sector comprises acute care beds and the largest serves the psychiatric patients and long-term care residents.[7]
*220 Based on a panel study undertaken by the county in 1997, it was recommended that the county implement a repositioning plan for the hospital. By resolution adopted on December 17, 1997, the repositioning plan was approved of the Board of Chosen Freeholders, which stated in part,
WHEREAS, (a) in order to provide quality care and services to the residents and patients of Bergen Pines in an efficient and cost effective manner, (b) in order to strengthen and enhance the ‘safety net’ of health care sendees that have been provided at Bergen Pines for more than 80 years, (c) in order to effectively respond to changes in applicable laws and regulatory requirements within its current organizational structure and budgetaiy constraints, and (d) in order to effectively respond to structural and organizational changes that have occurred and are occurring in the health care market that will make it increasingly difficult for the County to effectively operate Bergen Pines, the County had previously determined to seek to transfer the management, administration, operation and maintenance of Bergen Pines to a firm or organization possessing demonstrated expertise in the management of similar facilities; ...
By way of a resolution passed by BCIA, the improvement authority agreed to “assume responsibility for the management, administration, operation and maintenance of Bergen Pines” including the “issuance of taxable debt obligations to provide funds which are sufficient to, among other things, enable the county to comply with applicable income tax regulations relating to the county’s outstanding tax-exempt debt obligations previously issued with respect to Bergen Pines” as a county improvement authority authorized by statute, N.J.S.A. 40:37A-55, to exercise “public and essential governmental functions to provide for the public convenience, benefit and welfare.”
Implementation of the repositioning plan would effectuate transfer of the hospital operator’s license to BCIA. Further, the county would lease to BCIA the Bergen Pines real property and business assets, including the buildings, structures and equipment for a term of nineteen years. BCIA would then contract with a third party to manage, administer, operate and maintain the hospital on a day-to-day basis for and on behalf of and as agent of BCIA as the license holder for a nineteen year term
The county and BCIA entered into a Lease dated December 17, 1997 (Lease). By way of a Lease (Sublease) and Operating Agreement of the same date, between BCIA and Solomon, Solo *221 mon agreed to provide all of the required hospital management services. In accordance with the terms of the two agreements the day-to-day management services were transferred from the county for a nineteen-year term beginning on March 15, 1998, and Bergen Pines Hospital became known as Bergen Regional Medical Center.
The county defendants applied to the New Jersey Department of Health and Senior Services (Department) for a certificate of need[8] transfer, to allow the county to lease the assets and transfer the hospital operating license to BCIA. The application for the certificate of need represented that the county repositioning plan for the hospital would “preserve public ownership of Bergen Pines County Hospital and would assume the continuation of accessible, high quality care to the indigent and medically unserved populations of Bergen County,” the same language as set forth in the Lease. The Department approved the certificate of need application for the transfer of the hospital and declared that all conditions placed on the certificate of need for Bergen Pines “shall remain in effect and are incorporated as if set forth in their entirety herein.”[9] According to the final decision of approval issued by the Department, “[t]his transfer is required to assure continued viability of a facility that provides substantial indigent care in a rapidly changing health care arena.”
Defendants attached copies of two recent hospital licenses issued to BCIA, effective October 1, 2010 expiring September 30, 2011, by which BCIA was licensed to operate Bergen Regional Medical Center consisting of 173 Acute Care beds, 323 Behavioral *222 Health Care Beds, and 574 Long Term Care beds.[10] Solomon assigned its rights under the Sublease and Operating Agreement to BRMCLP (Manager), a New Jersey for-profit limited partnership and a Solomon affiliate designated by Solomon to provide the hospital management services.* [11]
Under the Sublease and Operating Agreement BCIA remains responsible “for the overall conduct of Bergen Pines” as holder of the hospital license and “shall establish and maintain a Contract Compliance Unit that will work with an Oversight Board to monitor operations at Bergen Pines.” Through the same document the county has reserve powers over the hospital management including the “[authority to approve or disapprove of ... any modifications in the manner that sendees are proposed to be provided at Bergen Pines by the Manager that, in the reasonable judgment of the County, adversely affects or is likely to adversely affect the quality of care being provided ... at Bergen Pines or advei’sely affect[s] ... the ability of Bergen Pines to provide a ‘safety net’ for residents and patients of Bergen Pines.”
A summary of the relevant terms of the agreements governing the rights and responsibilities of the parties follows: BRMCLP pays a fixed annual rent of $5,200,000 to BCIA for lease of the property and business assets, adjusted annually by 50% of the increase in the Consumer Price Index. If the hospital operations realize a “reasonable profit” the rent is increased by the greater of 4%, or the full CPI increase, commencing on and after the eighth anniversary of the lease commencement date. Since 2006 the rent *223 has increased by the 4%, evidence that the Manager has realized “reasonable profit” from the hospital operation. Beyond the fixed rent, BRMCLP is required to pay “Additional Rent” to BCIA which consists of any payments in lieu of taxes or real estate taxes if any are due, as well as other charges that may be imposed by any governmental entity. In the event that BRMCLP incurs the payment of real estate taxes or an assessment, BCIA is required to reimburse BRMCLP for any amount paid.
As Manager, BRMCLP is responsible for the day-to-day management of the hospital. BRMCLP must keep and maintain the hospital in good and safe order. BRMCLP is responsible for all hospital operating expenses[12] and utilizes its own employees to manage, administer, operate and maintain the hospital at its own cost and expense. Capital improvements are to be made at the cost and expense of BCIA.
In return, BCIA pays BRMCLP a monthly management fee of $9 million designed to compensate for the management services and expenses incurred. BRMCLP collects all revenues from the operation of the hospital, called “cash receipts” which are deposited in a BCIA account.[13] The Sublease and Operating Agreement require that “the Manager shall be obligated to use its reasonable best efforts to maximize the revenues that it collects on behalf of the BCIA from all revenue sources and to ensure that revenues are collected in a timely manner.” The Manager is obligated to submit vouchers for the reimbursement for patient and resident care through Medicaid and Medicare, private insurance companies, pension, social security and other such sources. In the event that cash receipts collected by the hospital fall below $9 million the *224 management fee paid to BRMCLP is reduced by the difference. As a corollary to that provision, any cash receipts received that exceed the amount of the monthly management fee are paid to BRMCLP. The Assistant Vice President of Finance for BRMCLP testified at deposition in this matter that in 2009 in excess of $50 million of revenue was collected from patient hospital services and paid to the Manager. Neither party presented evidence of the hospital expenses or the amount of profit realized by the Manager in 2009 or for any other year. Defendant acknowledged that the Manager is deriving a profit from its management and operation, at its sole expense, of the county hospital.
After assuming the management of the hospital, the BRMCLP entered into over thirty leases and time-share agreements[14] with for-profit and not-for-profit entities who occupy space in the hospital, including: twenty physician/physician groups; a massage therapist; Eden Ambulance Corporation; Eden Healthcare, Co. (two leases); On Time Transport Inc. and On Time Ambulance, Inc.; Ho Ho Kus School of Secretarial and Medical Services (1998 lease with 2002 addendum naming Ho Ho Kus School CNA Plus Program); Lamajak Inc., d/b/a Lori’s Hospital Gift Shops; Lifespire New Jersey, Inc. (Autism After-School Services); Opiate Detoxification Institute; Straight and Narrow, Inc.; and Jay Analovitch, VP of Life Source Services of NJ, LP.[15]

The assessment and claimed exemption

Plaintiff underwent a reassessment in 2007 which resulted in a (non-taxed) assessment to Lot 1 for tax year 2008:
Land 31,440,000
Improvements 76,595,200
Total 99,035,200
The hospital contains a total building area of over one million square feet (including the roof and outdoor area), and a usable area of the 888,667.40 square feet. Qualifier X represents approximately 14,562.80 square feet of the 888,667.40 square feet of useable area within the 22 hospital-related buildings and struc *225 tures located in Lot 1. It consists of some or all of the spaces within the buildings located on Lot 1 which have been leased to the third-party service providers, but these spaces have not yet to date been identified with any degree of specificity by the assessor. Qualifier X is assessed, for the improvement only, in the amount of $572,400.00 and the taxes have been paid each year.[16] The hospital was fully exempt from the payment of property taxes until the assessment placed on qualifier X in 2005. The assessments on both Lots 1 and Qualifier X have remained the same for tax years 2008 through 2011.
Plaintiff described a 2004 article about the hospital published in a local county newspaper. It was reported that the private hospital manager, BRMCLP, had violated its contract by subleasing the laundry room to a company that used the facility to wash the linens of other entities for a fee. BCIA raised an objection and the practice ceased. The assessor became aware of the article and undertook an inspection of the hospital to determine if there was other third-party use of the hospital. According to the assessor, “we taxed the properties that were for-profit that were paying rent whether it would be the doctors and whether it be the gift shop.”
Defendants seek a judgment that the subject property is wholly exempt and argue that the lease of the hospital to a for-profit manager does not affect the tax exempt status since BRMCLP operates the hospital as an agent of the BCIA serving the “public benefit” of the county residents. Further, in its role BRMCLP continues to fulfill its “public purpose” of “continued maintenance and enhancement by BCIA of a ‘safety net’ of accessible high quality healthcare services to the indigent and medically unserved populations of Bergen County.” Accordingly, they contend that the property is exempt from taxation as county owned property used for a public purpose pursuant to N.J.S.A. 54:4-3.3 and devoted to a “public use.” Similarly, the services performed by third-party providers, whether for-profit or not-for-profit entities, *226 are in furtherance of and incidental to the public purpose for which the tax exemption was granted to Block 6402, Lot 1.
Defendants further contend that if Qualifier X is found to be of private use, the private use is de minimus because the space represents approximately 14,562.80 square feet within the 22 hospital-related buildings and structures, and such a de minimus use does not invalidate an exemption claim. Finally, any argument that the leased spaces should be taxed under the Leasehold Taxing Act, N.J.S.A. 54:4-2.3 also has no merit, since the spaces would only be taxable under the Act if they were found to be used for “private purposes” defendants assert.
As framed by plaintiff the issue is whether the hospital remains entitled to a tax exemption because it is now operated by a private for-profit entity realizing a large profit from the operation of both the hospital and “non-hospital entities,” and, as such, is being put to a private, for-profit use rather than serving a public use or public purpose under N.J.S.A. 54:4-3.3.

Summary Judgment standard

This court is guided by the standard set forth in the seminal case Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 666 A.2d 146 (1995). The case directs that when faced with a motion for summary judgment the court must consider “whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.” Id. at 523, 666 A.2d 146. In accordance with R. 4:46-2, which governs motions for summary judgment, “[t]he judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.”

The relevant exemption statutes

In considering defendants’ claim for exemption, the court relies on the well-settled law that “[t]he taxing power lies at the *227 heart of government. Without taxes government could not function. Any impairment of the taxing power affects the lifeblood of government. Accordingly claims for tax exemption have to stand scrutiny to show that they serve a public purpose [citations omitted].” New Jersey Turnpike Auth. v. Township of Washington, 16 N.J. 38, 44, 106 A.2d 4 (1954).
Thereby, the propriety of a tax exemption is not determined by the ownership of property but rather by its manner of use. The use must fit within the scope of the statute and its purpose for a statutory exemption to apply. Id; see also Township of Holmdel v. N.J. Highway Auth., 190 N.J. 74, 918 A.2d 603 (2007); Township of Hanover v. Town, of Morristown, 4 N.J.Super. 22, 66 A.2d 187 (App.Div.1949). “Tax exemptions in favor of nongovernmental owners are strictly construed in the sense that an exemption will not be extended beyond the ascertainable intention of the Legislature. On the other hand it has been held that exemptions in favor of governmental agencies should be liberally construed.” Walter Reade, Inc. v. Township of Dennis, 36 N.J. 435, 440, 177 A.2d 752 (1962) (citations omitted).
The history of the county public hospital can be traced through the statutes. Counties are obligated by law to bear the cost of hospitalization for mentally ill residents and other patients unable to pay the cost of care and maintenance. N.J.S.A 30:4-68; see also Ann Klein v. County of Hudson, 187 N.J.Super. 603, 455 A.2d 583 (Law Div.1980), aff'd, 187 N.J.Super. 433, 455 A.2d 491 (App.Div.), certif. denied, 91 N.J. 533, 453 A.2d 855 (1982).[17] To that end, the Legislature provided counties with a population over 400,000 with the statutory authority to construct and maintain a hospital, N.J.S.A. 30:9-12.1, to care for the following: (a) persons suffering from communicable diseases; (b) mentally ill persons; (c) sick, disabled, or aged persons of the low-wage group, who are hereby defined to be those persons who are unable to pay prevailing semi-private hospital charges. N.J.S.A. 30:9-12.8.
*228 County owned property used for a public purpose is statutorily exempt from property taxes pursuant to N.J.S.A. 54:4-3.3. The statute states in relevant part,
Except as otherwise provided by article 1 of this chapter (§ 54:4-1 et seq.), the property of the State of New Jersey; and the property of the respective counties, school districts and taxing districts used for public purposes ... shall be exempt from taxation under this chapter____
A second exemption statute is relevant to the facts. The property and projects of an improvement authority are likewise subject to exemption from local property taxes. N.J.S.A 40:37A-1 to 135, County Improvement Authorities Law (Authority Law). Defendant relies on the exemption set forth in at N.J.S.A. 40:37A-85, which states in relevant part:
All properties of an authority are hereby declared to be public property of a political subdivision of the State and those properties, and all public facilities, whether or not owned by the authority, are devoted to an essential public and governmental function and purpose and shall be exempt from all taxes and special assessments of the State or any subdivision thereof.
Application of either statute requires that the property be used for a public purpose. Operation of a county owned hospital is clearly a public purpose.
Plaintiff here urges the court to cancel the hospital exemption and claims that “[wjith respect to the issue of whether a particular use of a property qualifies for tax exemption, a crucial factor is where the profit goes. If a court can trace it into someone’s personal pocket, the use will not be entitled to a tax exemption.” To support this proposition, plaintiff relies on Paper Mill Playhouse v. Township of Millburn, 95 N.J. 503, 472 A.2d 517 (1984); Trenton v. N.J. Div. of Tax Appeals, 65 N.J.Super. 1, 166 A.2d 777 (App.Div.1960); and AHS Hosp. Corp. v. Town of Morristown, 25 N.J.Tax 374 (Tax 2010).
The cases cited by plaintiff in support of the argument do not interpret the breadth of the county and improvement authority exemption statutes. Rather, they involve property which is the subject of exemption under N.J.S.A 54:4-3.6. That law applies to an exemption for property owned or used by a not-for-profit entity *229 otherwise eligible under the statute’s requirements. Included among its provisions is the use of property for hospital purposes.
N.J.S.A. 54:4-3.6 reads in relevant part:
The following shall be exempt from taxation under this chapter ... all buildings actually used in the work of associations and corporations exclusively for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion shall only be exempt; ... provided, in cases of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit....
In Paper Mill Playhouse, supra, a non-profit corporation sought an exemption under N.J.S.A. 54:4-3.6. A three-prong test was set forth by the Supreme Court to be met for a property to be deemed exempt under the statute.[18] The third prong requires “its operation and use ... must not be conducted for profit.” Paper Mill Playhouse, supra, 95 N.J. at 506, 472 A.2d 517. Plaintiff in this case cannot sustain its position in reliance on N.J.S.A. 54:4-3.6 and the related eases. Rather, the issue must be analyzed under the exemption for county property, N.J.S.A. 54:4-3.3.[19] The plain language of that statute requires county ownership and use for a public purpose.
Plaintiff presents no facts or argument to dispute the contention that the BRMCLP continues to fulfill the “public purpose” of “continued maintenance and enhancement by the BCIA of a ‘safety net’ of accessible, high quality care to the indigent and medically unserved populations of Bergen County.” Rather plain *230 tiff acknowledges that the hospital continues to provide the same hospital services and serves the public purpose asserted. Plaintiff also agrees with defendants that the county was permitted to lease the property to BCIA and BCIA has the authority to make agreements for the use or operation of a public facility pursuant to the Authority Law. An improvement authority is designed to undertake governmental functions and “the purpose of every [improvement] authority shall be (a) provision within the county ... of public facilities for use by the ... county____” N.J.S.A. 40:37A-54.
As such, while the manager of the hospital has changed it is undisputed by the parties that the public purpose served by the hospital has not. The inquiry remains whether the exemption is lost because the hospital is managed through a private for-profit third party.
The courts have considered the issue in the context of various statutes intended to grant exemption to the property of public entities used for a public purpose. City of Newark v. Essex Comity Bd. of Taxation, 54 N.J. 171, 254 A.2d 513, cert. denied, 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 452 (1969); see also Holmdel, supra, 190 N.J. at 74, 918 A.2d 603; Walter Reade, supra, 36 N.J. at 435, 177 A.2d 752; Borough of Moonachie v. Port Auth., 38 N.J. 414, 185 A.2d 207 (1962).
In City of Newark the Court considered whether property qualified for an exemption as being used for a “marine purpose” under the Marine Terminal Act and thereby exempt. “If they were being so used, then clearly any incidental benefits to the private lessees of the Authority would neither impair the public purposes nor remove the tax exemption.” City of Newark, supra, 54 N.J. at 189, 254 A.2d 513. The Court reiterated the broad interpretation ascribed to “public purpose”,
The concept of public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be *231 accomplished and to the degree and manner in which the object affects the public welfare.
[Id. at 187, 254 A.2d 513 (citing Roe v. Kervick, 42 N.J. 191, 199 A.2d 834 (1964)) (citations omitted).)
Further guidance is provided by the high Court in Moonachie, supra. The Court there considered whether the land and the building erected on it by the Port Authority at the Teterboro airport and leased to a window manufacturer was exempt as falling within the purpose of the statute. The Court found that the land purchased for airport purposes was exempt as serving the use of a noise protection device however the building was not exempt. The agency leased its building “for a purpose foreign to its statutorily described public function.” Id. at 424, 185 A.2d 207.
Notably, this court in City of Egg Harbor v. County of Atlantic, 10 N.J.Tax 7 (Tax 1988) determined that county owned property leased to the New Jersey Department of Corrections for use as a juvenile detention center and operated by a private entity remained exempt. The evidence supported the fact that the private entity acted at the direction of the public entity to accomplish the statutory purpose. The operator of the facility was at the property “to carry out the directions, and to accomplish the purpose, of DOC” which included the “safekeeping, care, supervision and treatment of youth committed by a court.” Id. at 23. “The fact that the government agency employs a private company to carry out its public purpose should not result in local property taxation.” Id.
In County of Bergen v. Borough of Leonia, 14 N.J.Tax 142 (Tax 1994), this court considered whether the section of the county park used for riding stables retained the exemption where stables were operated by a private entity. The relevant statute granted an exemption where the park commission “made property available for recreational use” to the public. Id. at 154. The court found that the exemption applied since the use fit within the purpose set forth in the statute. In reliance on Walter Rea.de, the court concluded, “it is well settled in this State that if a public entity chooses to accomplish a statutorily authorized public purpose by private contract, the public property used to achieve that end will *232 not lose its tax exemption or become subject to tax.” Id.; see also N.J. Highway Auth. v. Town of Bloomfield, 8 N.J.Tax 637, 640 (Tax 1987) (holding that a McDonald’s restaurant located at a highway service station should be exempt from tax under the New Jersey Highway Authority Act since the “Legislature intended that the Authority furnish these facilities as part of its public service.”); Martin v. Borough of Collingswood, 36 N.J. 447, 177 A.2d 759 (1962) (private for-profit milk bar operating on property leased from county park commission exempt under a statute exempting such commission-owned property from taxation).
The exemption provided to highway projects was at issue in Holmdel, swpra. The Court found that the amphitheater constructed by the Highway Authority at the Garden State Arts Center was exempt because it fit within the purpose of the (grandfathered) statute while construction of the reception center on the premises exceeded the statutory purpose. The fact that the facilities were operated by private for-profit entities did not preclude application of the exemption.
This Court has recognized that private lease agreements do not automatically forfeit an agency’s tax immunity. See Walter Reade, supra, 36 N.J. at 441, 177 A.2d 752 (holding that private operation of highway sendee plazas did not forfeit governmental immunity). Rather, the determinative inquiry is whether the property is utilized in furtherance of the agency’s statutory mandate. Id. at 440-41, 177 A.2d 752. If a government property or facility is leased to a private entity and the private entity operates the property or facility in accordance with the agency’s statutory purpose, the tax immunity may still apply. Ibid.
[Holmdel, supra, 190 N.J. at 88-89, 918 A.2d 603.]
In Walter Reade, supra, the Court considered whether a statutory exemption afforded to the Highway Authority should apply to property along the Garden State Parkway on which the Authority constructed service areas with restaurant facilities, for the convenience of travelers. The statute specifically defined “projects” as “service areas ... stations, and ... facilities” which projects were exempt from local property taxes. The statute “empowers the Authority” to “make ‘all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this act.’ ” Walter Reade, supra, at 438, 177 A.2d 752. Rather than operate the facilities directly the Authority entered into an agreement with Walter Reade, a private for profit *233 entity. The municipal assessor had acknowledged that the exemption should apply to the agency but not while the property was operated by the third party. The Court found that “[t]he power of the Authority to contract for the operation of the restaurant facilities is amply provided in the provisions we have cited. That these facilities are part of the contemplated public use is not disputed. It is clear they so remained notwithstanding a ‘lease’ to a private operator.” Id. at 439, 177 A.2d 752. (citations omitted). The Court continued “[i]t would be strange for the Legislature to enable the Authority to choose among several modes of rendering this public service and then encumber the choice with tax consequences.” Id. at 440, 177 A.2d 752.
That reasoning applies equally to the facts before this court. The Legislature authorized the county to operate a hospital to fulfill its obligation to its residents and cloaked an improvement authority with permission to operate and maintain public facilities on the county’s behalf. A county improvement authority has the power “to make agreements ... for the use or operation of all or any part of any public facility____” N.J.S.A. 40:37A-55(i). The relevant statutes permit the public purpose to be achieved either directly or by contract for services and do not limit the actor to a not-for-profit entity. It would conflict with the intention of the Legislature if the election to deliver services by contract under these facts effectively destroyed the exemption. Moreover, as declared by the Supreme Court, the concept of public purpose is to be viewed broadly.
The management of the hospital for-profit does not of itself impair the public purpose. An enterprise organized for-profit hired to manage a property expects to render a profit. The facts establish that the arrangement between the county and the manager has not resulted in a diminished degree of care to the public. Rather it assisted the county in providing a higher quality of essential healthcare services to a population in need of care. The testimony of one local official in this matter describes the reputation of the former Bergen Pines hospital as “less favorable than other local hospitals”; however, he finds that Bergen Regional *234 Medical Center has the appearance of a more modern hospital that brings a better quality of care to the patients.
Notably, the provision of high quality public healthcare is a priority of the Legislature as declared in N.J.S.A. 26:2H-1 where it set forth “the public policy of the State that hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public.” The Legislature’s concern was incorporated in the statute regarding administrative oversight of health care service providers, including the requirement for a certificate of need. Id.
For these reasons the court finds that the act of leasing the property to a third-party to manage, administer, operate and maintain the hospital on a day-to-day basis on a for-profit basis does not affect the exempt status of the property since the hospital continues to serve the public purpose set forth by the statute.

Leases to third party service providers

However that does not conclude the court’s inquiry. The hospital manager engaged in leases and/or time-share agreements for space in the hospital. Those uses must also fit within the scope of and the purpose served by a county hospital for the county property statutory exemption to apply. The cases set forth above apply equally to this inquiry. The court is particularly mindful of the language set forth in Holmdel, supra.
Government tax immunities serve an important role in our society. They facilitate the provision of essential government services and create incentives for private entities to serve the public welfare. However, unauthorized exemptions from local property taxation can unduly burden particular communities that, by no choice of their own, are host to government agencies. It is therefore imperative that governmental immunities be subject to searching judicial review.
[Holmdel, supra, 190 N.J. at 99, 918 A.2d 603.]
Plaintiff argues that because portions of the property are leased to various sub-tenants for what plaintiff calls “private for-profit purposes” the entire property is taxable. Under N.J.S.A. 54:4-3.3 the hospital cannot be a public facility with a private use. County of Essex v. City of East Orange, 214 N.J.Super. 568, 520 A.2d 788 *235 (App.Div.), certif. denied, 107 N.J. 120, 526 A.2d 189 (1987). The law does not allow a county owned building to be used for both public and private purposes and to enjoy a tax exemption. “There could be no apportionment for assessment purposes between the publicly and privately used portions of a county building where, as here, the claim for exemption was under N.J.S.A. 54:4-3.3.” Id. at 578, 520 A.2d 788. In County of Essex, the Appellate Division relied on Judge Rimm’s opinion in County of Ocean v. Township of Dover, 3 N.J.Tax 434 (Tax 1981), noting “ ‘[wjhen there is to be an apportionment, the Legislature has specifically provided for it.’ ” Ibid, (citation omitted).
Specific examples of such statutes include N.J.S.A 54:4-3.6 which was at issue in County of Ocean, as well as N.J.S.A. 54:4-3.6e and N.J.S.A. 40:37A-83, all of which expressly permit property used by an exempt entity to be leased in some part for private use as well. “From these specific provisions we infer a legislative intention that there be no apportionment when an exemption is claimed under N.J.S.A. 54:4-3.3 as that section does not authorize apportionment.” County of Essex, supra, 214 N.J.Super. at 578, 520 A.2d 788. Therefore any private use of the Bergen Regional Medical Center, or any use not authorized by the enabling statute, will negate the hospital exemption.
Regarding the actual manner of use by the third-party operators, defendants offered scant evidence. There were statements provided through the certification of the BRMCLP Assistant Vice President of Finance and limited deposition testimony that offered no evidence of actual use. He certified that spaces used by the providers are “both consistent and supportive” of the mission of BRMC in “providing a safety net to the population of Bergen County” since the BRMC is still being operated “for the public purpose of serving the citizens of Bergen County”. According to the witness “all spaces as are the subjects of the agreements are for uses ‘in furtherance of and ‘incidental to’ the ‘public purposes’ for which a tax exemption was granted to Lot 1, Block 6402, that is a ‘safety net’ of quality healthcare services to the indigent and medically unserved populations of Bergen county and ‘essentially *236 serve’ the ‘public purposes’ that the county and BCIA are authorized ‘to further.’ ”
Defendant also provided copies of the leases which included the use and occupancy of medical office space by physicians and health care practitioners. It is unclear from the leases whether any physician or health care practitioner actually renders services to hospital patients. Among them, are five agreements entitled “Time-Sharing Agreement: Use and Occupancy of a Medical Office.” They provide for specific times during the week or month that physicians or health care practitioners can use and occupy the premises. The time-sharing agreements have language restricting the use of the premises as “solely for the purpose of conducting, on a timeshare basis, a private medical or health care practice____” The agreements also establish a relationship “solely that of a Sublandlord and a Subtenant.” Therefore, it is unclear from these agreements alone to what extent the physicians and the service provider actually provide professional medical services to patients of the hospital.
Similarly confusing are the sixteen “Lease Agreements” made between BRMCLP and other physicians or healthcare providers. Like the time-sharing agreements mentioned above, these leases set forth specific time sets for use and occupancy. They also provide language that the premises are to be “used and occupied only and for no other purpose than physieian/medieal office space.” There is no mention of any physician or health care practitioner duties or guidelines as they relate to providing medical services to patients of the hospital. For example, a massage therapist is listed as renting a suite from BRMCLP to render services on Wednesdays from 5:00pm to 8:00pm. The agreement is silent as to whether these services effectively serve hospital patients or private patients, and whether she is obligated to serve the hospital population.
Notably, there is one agreement entitled “Professional Services Agreement” between BRMCLP and an orthopedics corporation that initially seems to fall within the purposes of providing facilities so that the sick and injured of the hospital community can be *237 given proper medical care and treatment. The agreement provides for a fixed annual rental payment of $10,008 in exchange for use of the premises and certain professional services. It states in relevant part that the hospital:
[H]ereby engages and retains Contractor for the following purposes (a) to provide Hospital patients with general orthopedic services and orthopedic surgical services (hereafter, “Orthopedic Services”) through Contractor’s physician employees (“Physicians”); (b) to provide a Chief for Orthopedics Section; (c) to provide on-site Physician coverage for Hospital patients who require Orthopedic services; (d) to arrange for the provision of on-call physician coverage of the Orthopedics Section....
The agreement also states that “all professional medical services to be rendered by Contractor and the Physicians shall be performed for the benefit of Hospital pursuant to this Agreement.” More specifically, the agreement requires the physicians to be available “to provide professional medical services to all patients of Hospital fifty-two (52) weeks per year____” and that the Contractor shall “provide professional services to charity care patients without any reimbursement.” The agreement also requires the physicians to be part of the hospital’s insurance program, Bergen Direct, for hospital employees.[20] These are all clearly defined roles between the physicians and the hospital in connection with the way professional medical services are to be delivered to the hospital population.
According to the deposition testimony from a BRMCLP representative, the purpose of the subleases to the physicians is to “attract a good physician to your hospital to give that physician proximity to the patient population [which] escalates the level of *238 care provided within the hospital.” He testified as well that services rendered by the subtenants may not be provided solely to hospital patients. He did not explain whether each physician in fact serves the hospital population or whether the space is used either wholly or predominately to provide services to private clients.
One rather suspect lease is the affiliation agreement between BRMCLP and Ho Ho Kus School of Secretarial and Medical Sciences. According to the agreement the hospital will provide the facilities “reasonably necessary for the course ‘Certified Nurse Aide’ at a cost of $1.00 per year to the school and shall make available to the students the space, facilities, equipment, and supplies necessary for rendering a Certified Nurse Aide Program ...” Furthermore, the hospital is to “make available space and facilities for clinical instruction, including pre-conferences, and post-conferences, and necessary locker room facilities or equivalent storage space.” It is unclear how an education program or school comports with the statutory purpose of a county hospital.
In other deposition testimony, a witness explained that the rehabilitation/detoxification services are “related to the hospital’s goal of a more rapid out-patient detoxification program.” The record, however, is void of any details regarding the population actually served by the program. With regard to the Autism After-School Services the witness had “zero-familiarity” with the services but “surmise[d] it’s potentially an expansion of services for the medical center.” Rather than providing specific facts, defendants relied on conclusory statements that the leases are “consistent and supportive of the mission of the hospital over the years”, which does not assist this court in making a determination as to the actual nature of the third-party services and whether the providers render care to the hospital population.
Further, the lease commencement dates vary from 2001 through 2007, the occupancy terms vary from one to ten years, and some leases contain the option to renew while others do not. Therefore, the court is unable to determine which providers occupied the *239 spaces on the valuation dates (October 1 of each pre-tax year at issue).
Left unresolved by the evidence is whether the nature of the third-party services fall within the purpose of the county hospital statutes and whether they provide care to the population served by the hospital. Once ascertained, the court will examine whether the services represent an expansion of the hospital beyond the intent of the enabling statute which would nullify the exemption. Holmdel, supra, 190 N.J. at 74, 918 A.2d 603 (“Application of any particular immunity must ‘stand scrutiny’ to demonstrate the object or activity for which the immunity is sought within the boundaries of the governmental entity’s statutory powers and within the provisions of the specific statute granting the asserted immunity.”).
Two other issues raised by defendants in support of the exemption must be addressed by the court. The first is whether the leased uses are de minimus in nature. Defendants contend that even if the leases are found to be for a “private purpose” such uses represent approximately 14,562.80 square feet of the total useable area of the hospital (888,667.40 square feet). That would equate with approximately 1.6% of the total area and therefore constitute a de minimus use.
Defendants rely on Boy’s Club of Clifton v. Township of Jefferson, 72 N.J. 389, 371 A.2d 22 (1977), a case decided pursuant N.J.S.A. 54:4-3.6 where the exemption applied to a non-profit entity. See also Greenwood Cemetery Ass’n of Millville v. City of Millville, 1 N.J.Tax 408, 414 (Tax 1980) (d,e minimus rule is a “narrow exemption” to profit making prohibition of N.J.S.A. 54:4-3.6 that allows an “occasional or incidental nonexempt activity, or a regular nonexempt activity which is of an inconsequential or de minimus character will not preclude” otherwise exempt status.)
The Appellate Division also considered the issue in County of Essex, supra, 214 N.J.Super, at 568, 520 A.2d 788. The case involved an exemption for county property where the assessment had been apportioned one-fourth to the private use and three-fourths to the public use. The court found the private use was not *240 de minimus. Thereby, this court’s determination on the issue must await further findings of fact.
Both parties raise the question whether the Leasehold Taxing Act N.J.S.A. 54:4-2.3 applies to the facts of this ease. Plaintiff argues that because spaces in the hospital are leased to other entities it may affect the exemption, or, create a tax liability under the Act, and defendant denies that either is true. The court resolved both the issue of apportionment of assessments and the application of the Act in the context of an exemption under N.J.S.A. 54:4-3.3 in County of Essex, supra, at 568, 520 A.2d 788. The county owned building was used in part for public purposes and partly for private use. Seeking to collect taxes on the private spaces only, the county urged the court to apply the Act to permit the private spaces to be taxed. The court found that the Act did not apply.
“We see nothing in N.J.S.A. 54:4-2.3 even remotely impacting on the requirement for exemption under N.J.S.A. 54:4-3.3 that county property be used for public purposes. Further, N.J.S.A 54:4-2.3 by its terms is applicable when the leasing of tax exempt property does not make the property taxable. In this ease the leasing does make the property taxable so no assessment may be made on the basis of the tenancy.” Id. at 579, 520 A.2d 788; see also, County of Essex v. City of East Orange, 7 N.J.Tax 346, 355 (1985) (holding that the Act “applies to property which is tax exempt by virtue of its ownership. As such, it would apply to federally owned property where there is no requirement of public use.”). Because the exemption statutes at issue require that the property be used for a public purpose, the Act has no application to these facts. The nature and use of the leased spaces remain to be determined at trial, the outcome of which will either render the property wholly exempt or wholly taxable.[21]
Defendants’ motion for summary judgment and plaintiffs cross-motion for summary judgment are denied and the matter will be set down for trial.

 Borough of Paramus, County of Bergen, Bergen County Improvement Authority, Solomon Health Group LLC and Bergen Regional Medical Center, L.P.

 Reference to Lot 1, Qualifier X, will be abbreviated Qualifier X.

 Block 6401 Lot 1 has assigned to it a non-taxed assessment.

 The parties previously agreed that the exemption and valuation issues should be bifurcated since the exemption issue precedes that of valuation, and it was so ordered by the court. As such, the motions relate to the exemption count only.

 A portion of the earlier version of the opinion released to the parties addressing procedural aspects of the case has been removed from this opinion.

 The hospital includes inmates housed on the property. It also provides drug and alcohol rehabilitation services on both a daily and live-in basis.

 As set forth by statute, "[n]o health care facility shall be constructed or expanded, and no new health care services shall be instituted after the effective date of L. 1971, c. 136 (C.26:2H-1 et seq.) except upon application for and receipt of a certificate of need as provided by L. 1971, c. 136 (C.26:2H-1 et seq.).” N.J.S.A. 26:2H-7.

 Neither the application for the certificate of need nor the certificate itself was provided by the parties to the court. Excerpts from the application, and the fact that it was approved, were set forth in certifications submitted by plaintiff in support of the motion.

 The first license permits a "General Acute Care Hospital consisting of: Bed Complement: 164 med/surg, 9 adult ICU/CCU, 232 Adult Acute Psych, 40 Adult Closed Acute Psych, 20 Adult Intermediate/Specialized Psych; Service Complement: 2 Inpatient ORS, 1 SDS OR, 1 Cystoscopy Room, 1 Mobile MRI”. The second license permits a "Hospital Based — Long Term Care Facility consisting of [562] Long-Term Care Beds [,][12] Ventilator Care Beds [].” The sum of all of these beds totals 1070. However, defendants' statement of facts lists a total of 1185 beds. The exact figure is not relevant to the court’s decision.

 There are five supplements to the Sublease and Operating Agreement between BCIA and Solomon: dated March 13, 1998, April 9, 2001, November 17, 2003, July 16, 2006 and January 2008.

 Operating expenses include maintenance, replacement items and repairs, including interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen.

 "Cash receipts” consist of patient medical bill payments, patient insurance payments which include Medicare and Medicaid, revenue received by the hospital for the care of inmates, revenues from other state and federal sources, along with the rental income received from subleases to the third party service providers.

 The court will collectively refer to the agreements as "leases".

 Copies of the documents were attached to defendant's moving papers.

 BRMCLP has paid the taxes on Qualifier X of which the county defendants were unaware until the commencement by plaintiff of the 2008 proceeding.

 Legislation originally enacted in 1890 permitted a county board of chosen freeholders to issue bonds "for the purpose of erecting a suitable county lunatic asylum." N.J.S.A. 30:4-68.

 In 1985, the Legislature amended N.J.S.A. 54:4-3.6 which affected the three-prong test utilized by the court in Paper Mill Playhouse. The statute had permitted an exemption on all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children. As amended the statute eliminates the "exclusivity of use" requirement. Int’l Schools Servs. Inc. v. Township of West Windsor, 207 N.J. 3, 21 A.3d 1166 (2011).

 The exemption for property of an improvement authority is also relevant, N.J.S.A. 40:37A-85, but the analysis required is identical in the context of both statutes. That is, does the operation of a public facility by a for-profit entity defeat the exemption.

 it should be noted that some of the lease agreements described above provide the same language referring to the hospital employee based insurance program. However, it is only optional for tenants to join. Some of the leases have language to this effect: "All tenants who lease space in the Physician Private Practice Suite will be provided the opportunity to become a participating provider in the Bergen Direct health plan for the hospital's employees." If tenants participate in the program, hospital employees do not incur any out-of-pocket expenses (copayments) in connection with medical services received by the tenants. A trial can best establish whether the tenants under these leases are solely providing medical services to patients outside the hospital and to hospital employees, leaving behind the hospital community meant to be served by the statute.

 The court does recognize that the de minimus rule may be found to apply.